IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

STATE OF COLORADO,

       Plaintiff,

v.

UNITED STATES OF AMERICA;
TABLE MOUNTAIN RESEARCH CENTER,
  f/k/a COLORADO SCHOOL OF MINES RESEARCH INSTITUTE;
CHEVRON CORPORATION;
INDUSTRIAL MINERA MEXICO, S.A. de C.V.;
MEXICANA DE COBRE, S.A. de C.V.;
FREEPORT-MCMORAN CORPORATION;
BP AMERICA INC.;
COTTER CORPORATION (N.S.L.);
ELF AQUITAINE, INC.;
TERRA INDUSTRIES INC.;
and
EXXON MOBIL CORPORATION,

       Defendants.

---

**CONSENT DECREE**

---

BACKGROUND

    A.    The STATE OF COLORADO ("Colorado") is filing a complaint (the "Complaint") in this matter pursuant to sections 107(a) and 113 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") against the above-named Defendants, seeking reimbursement of response costs incurred and to be incurred for response actions taken at or in connection with the release or threatened release of hazardous substances at the CSMRI Site in Golden Colorado (as described below, the "Site").

1

**EXHIBIT A**

B.    The Complaint arises out of activities in connection with a mining research center established at the Site in 1912. The research center was used to develop new technologies and products and for other purposes generally related to mining. Minerals, ores and other materials were brought to the research facility for analysis, beneficiation and experimentation. In 1987, all such operations ceased at the facility.

C.    Pursuant to the Colorado Radiation Control Act, C.R.S. Title 25, Art. 11, and the State of Colorado Rules and Regulations Pertaining to Radiation Control, Part 3, the Colorado Department of Public Health and Environment ("CDPHE") radiation control unit issued to the Colorado School of Mines Research Institute ("CSMRI") as licensee Radioactive Materials License No. Colorado, 617-01, as amended, with an expiration date of February 28, 2011 ("CSMRI License"). The CSMRI License does not clearly define the area subject to it, but that area generally includes at least parts of the Site. The licensee has obligations under the license to decommission the Site and obtain license termination ("Site-related obligations"). CDPHE has been involved in investigation and cleanup activities at the Site pursuant to the CSMRI License and applicable regulations. The CDPHE radiation control unit separately issued to the Colorado School of Mines ("CSM") as licensee Radioactive Materials License No. Colorado, 1206-01, with an expiration date of July 26, 2017 ("CSM License"). The CSM License generally covers the possession and storage of ground water containing uranium, and any unknown sources of radioactive material contributing to uranium in ground water within the portion of the Site known as the Lower Terrace. Subsequent to the issuance of the CSM License, CDPHE terminated the CSMRI License by Amendment Number 08, dated December 19, 2012.

D.    The Parties contemplate that the remaining Site-related obligations will consist of appropriate actions to address the ground water contamination detected in the monitoring wells located on the Lower Terrace and Former Settling Pond Area (as described in Attachment A). CDPHE is considering different approaches to radioactive materials licensing for the remaining Site-related obligations. The Parties contemplate that Site-related obligations will terminate when CDPHE issues a no further action determination, license termination, approval of

2

institutional controls or similar action for the CSM License that cover such remaining Site-related obligations.

      E.    The Parties that have entered into this Consent Decree ("Decree") do not admit any fact or liability arising out of the transactions or occurrences alleged in the Complaint or otherwise.

      F.    This Decree has been negotiated by the Parties in good faith.  Settlement of this matter will avoid prolonged and complicated litigation between the Parties.  This Decree is fair, reasonable, and in the public interest.

      Now, therefore, upon the consent and agreement of the Parties, this Court Orders, Adjudges and Decrees as follows:

## I. JURISDICTION AND VENUE

      1.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §§ 9607 and 9613(b).  This Court also has personal jurisdiction over the Parties.  Venue in this District is proper pursuant to 42 U.S.C. § 9613(b) because the actions giving rise to this case occurred in Colorado.  The Parties waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District for purposes of this Decree with these Parties.  Colorado reserves all rights it may have to assert Eleventh Amendment privileges and immunities against any person not a Party to this Decree. The Parties shall not challenge the terms of this Decree or this Court's jurisdiction to enter and enforce this Decree.  Pursuant to this Decree, the Court retains jurisdiction to enforce the terms of this Decree, including but not limited to hearing disputes pursuant to Paragraph 10 and hearing claims for Unanticipated Future Response Costs incurred at the Site to the extent provided in Paragraph 20 of this Decree.

## II. DEFINITIONS

2.      Definitions. Unless otherwise expressly provided in this Decree, terms used in this Decree that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Decree or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply solely for purposes of this Decree:

a.      "Affiliate" means, with respect to any specified person or entity, any other person or entity that, directly or indirectly, controls, is controlled by or is under common control with such specified person or entity; with the term "control" (and its derivatives) meaning the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person or entity, whether through the ownership of voting securities, contract or otherwise. The term "Affiliate" shall not include any entity identified on Attachment B.

b.      "Cash Out Party" shall mean any Party, other than Colorado or CSMRI, that pays its Negotiated Share of Cash Out Payment pursuant to Paragraph 28 of this Decree.

c.      "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601-9675.

d.      "CDPHE" shall mean the Colorado Department of Public Health and Environment, and any successor departments, agencies, or instrumentalities.

e.      "Colorado" shall mean the State of Colorado and all of its agencies, departments, and instrumentalities including the Colorado School of Mines, and their officers, agents, and employees.

f.      "CSM" shall mean the Colorado School of Mines.

g.      "CSMRI" shall mean the Colorado School of Mines Research Institute, a Colorado non-profit corporation, now by name change known as Table Mountain Research Center.

h.      "CSMRI Site" or "Site" shall mean the Colorado School of Mines Research Institute Site, located in Golden, Colorado, on the south side of Clear Creek, Section

4

33, Township 3 South, Range 70 West, including but not limited to the "Fenced Area," the "Lower Terrace and Former Settling Pond Area," the "Softball Area," the athletic fields and the "Greater Clay Pits Area," which comprise the CSMRI Site as depicted in Attachment A.

>(i).   "The Lower Terrace and Former Settling Pond Area" means that part of the CSMRI Site located immediately adjacent to the south side of Clear Creek, below the upper terrace area where the CSMRI Site buildings were located, part of which was formerly used for a tailings or settling pond for the research center.  The Lower Terrace and Former Settling Pond Area is depicted in Attachment A.

>(ii).   The CSMRI Site does not include the CSMRI Table Mountain facility, a separate research facility located on McIntyre Street in unincorporated Jefferson County, Colorado.

>i.   "Day" shall mean a calendar day.  In computing any period of time under this Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next working day.

>j.   "Decree" shall mean this Consent Decree and all attachments appended hereto.  In the event of conflict between this Decree and any attachments, this Decree shall control.

>k.   "Effective Date of this Decree" shall mean the date on which the Court enters the Decree.

>l.   "EPA" shall mean the United States Environmental Protection Agency and any successor departments, agencies, or instrumentalities.

>m.   "Incurred" shall mean (i) with respect to a direct and/or out of pocket expense, the date the expense is paid; (ii) with respect to interest, the date interest accrues; and (iii) with respect to a task that has an indirect expense associated with it, the date the task is performed.

>n.   "Interest" shall mean interest at the current rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded monthly, in accordance with 42 U.S.C. § 9607(a).

>o.   "Non-Cash Out Party" shall mean any Party, other than Colorado or

5

CSMRI, that does not pay its Negotiated Share of Cash Out Payment pursuant to Paragraph 28 of this Decree.

        p.     "Paragraph" shall mean a portion of this Decree identified by an Arabic numeral or a lower-case letter.

        q.     "Parties" shall mean Colorado, Settling Private Parties, CSMRI and the United States.

        r.     "Response Costs" shall mean all costs of "response" as that term is defined in Section 101(25) of CERCLA, 42 U.S.C. §9601(25), for response actions conducted at or in connection with the Site.

        (i).     "Past Response Costs" shall mean all Response Costs incurred from June 1, 1997, through January 31, 2012, by Colorado. Past Response Costs shall also include that portion of S.M. Stoller invoice #120201 that exceeds $47,274.03, the expenses for all other work performed to excavate, stockpile, remove, transport, dispose and analyze soil in 2011, and the expenses for site coordination tasks performed by CSM in January 2012, whether or not these expenses were "incurred" by January 31, 2012.

        (ii).     "Anticipated Future Response Costs" shall mean all Response Costs incurred after January 31, 2012, which are incurred pursuant to a work plan approved by CDPHE and which are necessary to address ground water contamination detected in the monitoring wells located on the Lower Terrace and Former Settling Pond Area in order to obtain a no further action determination, radioactive materials license termination, approval of institutional controls or similar action by CDPHE. Anticipated Future Response Costs do not include interest, legal fees and costs, or internal or indirect costs incurred by any Party, except Anticipated Future Response Costs include the reasonable costs of coordination of Site response activity, including administering the Joint Escrow Account described in Paragraph 7, by a CSM employee and reasonable and necessary compliance related, non-litigation legal fees associated with Site response activities. Anticipated Future Response Costs shall also include the first $47,274.03 of S.M. Stoller invoice #120201.

        (iii).     "Unanticipated Future Response Costs" shall mean all Response Costs incurred after the date of entry of this Decree that are not Anticipated Future Response

Costs.

      s.    "Section" followed by a Roman numeral shall mean a portion of this Decree identified by an uppercase Roman numeral.

      t.    "Settling Private Parties" shall mean those entities listed on Attachment C to this Decree; the respective predecessors, successors and past and present Affiliates of those entities; respective successors to such Affiliates (to the extent of their liability as successors); and all of such entities' respective officers, directors, agents and employees. CSMRI is not a Settling Private Party. The term "Settling Private Party" shall not include any entity identified on Attachment B.

      u.    "United States" shall mean the United States of America and all of its agencies, departments and instrumentalities, their officers, agents and employees, and all predecessors and successors to those entities, including but not limited to the Tennessee Valley Authority; United States Air Force; United States Army; United States Army Corps of Engineers; United States Bureau of Land Management, a bureau of the United States Department of the Interior; United States Bureau of Reclamation, a bureau of the United States Department of the Interior; United States Defense Logistics Agency, an agency of the United States Department of Defense; United States Defense Threat Reduction Agency; United States Department of Commerce; United States Department of Defense; United States Department of Energy; United States Department of the Interior; United States Forest Service; United States Geologic Survey, a bureau of United States Department of the Interior; United States Navy; United States National Institute of Standards And Technology, a bureau of the United States Department of Commerce; and the United States Office of Surface Mining, a bureau of the United States Department of the Interior.

## III. PARTIES BOUND

    3.    <u>Parties Bound</u>. This Decree applies to and is binding upon Colorado, the Settling Private Parties, CSMRI, the United States and their successors and assigns. The execution of this Decree and all actions taken pursuant to this Decree shall not, under any circumstances,

constitute or be construed as an admission by any Party of any fact or liability or a concession of any question of law with respect to the Site or with respect to any solid or hazardous wastes or hazardous substance allegedly contributed to or released at or from the Site. This Decree shall not constitute admissible evidence in any proceeding except in an action to seek enforcement of any terms herein or for the purpose of asserting the contribution protection provided in Paragraph 22, below. The Parties retain the right to controvert in any subsequent proceedings other than proceedings to implement or enforce this Decree, any and all issues of fact or law, unless this Decree specifically waives such right. The Parties agree not to contest the authority of any Party to enter into this Decree.

## IV.  SETTLEMENT PAYMENTS

4.      Payment of Past Response Costs. As soon as reasonably practicable after the Effective Date of this Decree, each Non-Cash Out Party will pay to Colorado its negotiated share of the past response cost settlement amount of $7,755,000 ("Negotiated Share of Past Response Costs Settlement") as set forth in Attachment D to this Decree. The Cash Out Parties will not make any payments under this Paragraph 4, but their respective Negotiated Shares of Past Response Costs Settlement shall be paid from their respective Negotiated Shares of Cash Out Settlement paid to Colorado under Paragraph 28, with no further payment by the Cash Out Parties. In Colorado's sole discretion, the Past Response Costs settlement payments may be allocated to Colorado's costs related to Site cleanup, including attorneys' fees, costs and interest, incurred prior to the Effective Date of this Decree; provided, however, that any such allocation shall be of no effect in any future proceedings among the Parties. In lieu of CSMRI making any payment for Past Response Costs to Colorado or any other Party, CSMRI will not recover or seek to recover from any other Party any Response Costs CSMRI has incurred. If a payment required under this Paragraph is not made in full by a Non-Cash Out Party within 120 days after the Effective Date of this Decree, then the non-paying Party will incur Interest on its unpaid balance commencing on the 121st day after the Effective Date of this Decree. If a private Non-Cash Out Party fails to make full payment of its Negotiated Share of Past Response Costs

8

Settlement referenced in Attachment D, Colorado may, in addition to any other available remedies or sanction, move the Court to enforce that Party's obligation. The prevailing Party in any such enforcement action shall be entitled to recover reasonable legal fees and costs.

5. <u>Payment Instructions for Past Response Costs</u>. Payments to Colorado made pursuant to Paragraph 4 shall be made by electronic wire transfer or by certified or cashier's check made payable to "Colorado School of Mines." If payment is by electronic wire transfer, the transfer shall be directed to the following account:

| | |
|---|---|
| **Bank Name:** | **Wells Fargo Bank West** |
| **Bank Address:** | **PO BOX 5247 Denver, CO** |
| **Account Name:** | **Colorado School of Mines** |
| **Routing Numbers** | |
| **ABA (ACH):** | **102000076** |
| **ABA (Wires):** | **121000248** |
| **Account Number:** | **0867605115** |
| **For international transfers** | |
| **SWIFT Code:** | **WFBIUS6S** |
| **EIN#:** | **84-6000-551** |

**Bank Address**
**National Western Division:**     **420 Montgomery St.**
**San Francisco, CA 94104**

**Bank Address**
**Local:**     **12601 W. 32nd Ave.**
**Wheat Ridge, CO 80033**

**Bank Contact, Pam Miller:**     **303-235-6508**

If payment will be made by check, each check shall reference the name and address of the Party making payment, this Decree, and the CSMRI Site name. The payment to Colorado shall be sent to: Colorado School of Mines, Senior Vice-President for Finance and Administration, 1500 Illinois Street, Golden, Colorado 80401-1887. At the time of payment, each Party shall send a notice to the Colorado School of Mines, Office of Legal Services, 1500 Illinois Street, Golden, Colorado 80401-1887, indicating that its payment was made.

6.    Insurance.  Colorado has obtained or will obtain the policy of environmental impairment liability insurance ("Insurance Policy") set forth in Attachment E for an area that will include the Site.  All of the Settling Private Parties and CSMRI shall be additional insureds under such Insurance Policy.  The Parties contemplate that, subject to its terms and conditions, the Insurance Policy will cover Unanticipated Future Response Costs, natural resource damages and other categories of claims and damages relating to the Site.

7.    Anticipated Future Response Costs; Establishment and Administration of an Escrow Account.

a.    Each Non-Cash Out Party and Colorado shall pay Anticipated Future Response Costs pursuant to this Paragraph 7 and Paragraph 9 in an amount equal to its share of Anticipated Future Response Costs set forth in Attachment D to this Decree, as modified pursuant to Paragraphs 28(a) and (b) ("Negotiated Share of Anticipated Future Response Costs").

b.    Colorado shall establish a joint escrow account (the "Joint Escrow Account") which shall be the repository for funds held to pay Anticipated Future Response Costs.  The Joint Escrow Account shall be subject to audit and inspection by any Non-Cash Out Party.  Within a reasonable time after the Effective Date of this Decree, the Non-Cash Out Parties and Colorado shall deposit into the Joint Escrow Account their respective shares of $224,460 as established by the Negotiated Shares of Anticipated Future Response Costs (on a percentage basis).  Of the $84,052.05 S.M. Stoller invoice #120201 dated February 16, 2012 for work performed during the period of December 26, 2011 through January 29, 2012, $47,274.03 will be paid from the joint escrow account.  The Parties' combined sum of $224,460 represents the Parties' current expectation of the funds needed to complete required known response actions at the Site, subject to the Replenishment provisions of Paragraph 9 herein.  The Parties expect that this sum will be expended in calendar year 2012.  The Joint Escrow Account will be administered by Colorado's Representative(s).  Payment shall be made pursuant to the instructions in Paragraph 5.  If payment will be made by check, each check shall reference the name and address of the Party making payment, this Decree, the CSMRI Site name, and that the check is for deposit to the Joint Escrow Account.

10

     c.     The requirements to establish, fund and replenish a Joint Escrow Account and to provide Notices of Assessment (as described in Paragraph 9 herein) may be waived or modified by the written agreement of Colorado and all Non-Cash Out Parties. Any written agreement entered under this Paragraph 7(c) shall modify only the process for making and accounting for payments of Anticipated Future Response Costs. All other terms of this Decree, including but not limited to the terms governing cost shares, work plans, budgets, dispute resolution and the termination of obligations, shall be unchanged by such an agreement. The Parties shall not be required to obtain judicial approval of any agreement entered under this Paragraph 7(c).

     8.    <u>Work Plans and Anticipated Future Response Costs</u>.

     a.     Each of the Non-Cash Out Parties shall designate one or more representatives (the "Non-Cash Out Parties' Representative(s)") and Colorado shall designate one or more representatives ("Colorado's Representative(s)") to consult on Anticipated Future Response Costs.

     b.     At least quarterly, and more often as warranted by Site conditions, the Non-Cash Out Parties' Representative(s) and their respective consultants, if any, will meet with Colorado's Representative(s) and consultants to discuss steps necessary to address ground water contamination detected in the monitoring wells located on the Lower Terrace and Former Settling Pond Area, including 1) the progress of any ongoing work at the Site, 2) the drafting of any work plans, 3) consultations or submissions to CDPHE or other regulators, and 4) a budget for the next year's Anticipated Future Response Costs (the "Consultation Meeting"). In developing work plans and budgets for Anticipated Future Response Costs, Colorado will consider all reasonable proposals of the Non-Cash Out Parties' Representative(s).

     c.     Work plans and budgets for Anticipated Future Response Costs shall include only work necessary and reasonable in order to obtain a no further action determination, radioactive materials license termination, the approval of institutional controls or similar action by CDPHE that terminates response activities with respect to ground water contamination detected in the monitoring wells located in the Lower Terrace and Former Settling Pond Area. Colorado will, when reasonable and appropriate, implement institutional controls and/or

engineering controls or their functional equivalent to minimize risks and costs. Colorado's implementation of such controls will be subject to review and approval by the Colorado School of Mines Board of Trustees, which approval shall not be unreasonably withheld.

       d.      Within a reasonable time before any Consultation Meeting, Colorado will provide the Non-Cash Out Parties' Representative(s) with a statement showing the Joint Escrow Account balance, transactions in the Account since the last such statement was provided, any proposed response actions, and a budget for Anticipated Future Response Costs for the coming year ("Paragraph 8(d) Statement").

       e.      If, between Consultation Meetings, conditions at the Site require unbudgeted expenditures totaling $50,000 or more, as soon as the need for the expenditures is established, Colorado's Representative(s) will provide the Non-Cash Out Parties' Representative(s) with written notice of the identified condition at the Site requiring the unbudgeted expenditures.

      9.      Replenishment of Joint Escrow Account.

       a.      Promptly after each Consultation Meeting, Colorado will provide the Non-Cash Out Parties' Representatives with a final budget for the next twelve months' Anticipated Future Response Costs. In December 2012, and annually thereafter, Colorado will provide the Non-Cash Out Parties' Representatives, and their agents designated pursuant to Paragraph 27, with a Notice of Assessment if a shortfall is projected (the "Projected Shortfall") between the Joint Escrow Account balance and the budgeted Anticipated Future Response Costs for the upcoming calendar year. Each of the private Non-Cash Out Parties and Colorado shall, within a reasonable time after such Notice of Assessment, deposit an amount equal to its Negotiated Share of Anticipated Future Response Costs (on a percentage basis) multiplied by the Projected Shortfall.

       b.      If the United States does not cash out, Colorado shall deposit the United States' Negotiated Share of Anticipated Future Response Costs (on a percentage basis) multiplied by the Projected Shortfall into the Joint Escrow Account. Colorado shall make such deposits within a reasonable time after it provides the first Notice of Assessment in December

2012, and annually thereafter. Within a reasonable time after December 31, 2013, and annually thereafter, the United States shall reimburse Colorado outside of the Joint Escrow Account in an amount equal to the Account's actual expenditures during the preceding year multiplied by the United States' Negotiated Share of Anticipated Future Response Costs (on a percentage basis). The United States shall make any such payments in accordance with Paragraph 5.

     c.    If any Notice of Assessment remains unpaid 120 days after receipt, the responsible Party shall incur Interest on the unpaid balance commencing on the 121st day.

    10.   <u>Dispute Resolution</u>.

    a.    Any Non-Cash Out Party, alone or in conjunction with any other Non-Cash Out Party(ies), may dispute all or part of any response action, proposed or final budget, expenditure or Notice of Assessment that Colorado asserts relates to Anticipated Future Response Costs (the "Disputed Matter"). Colorado may proceed with any response action it has selected pending resolution of the dispute. A dispute is initiated by submitting the written basis for the dispute to Colorado, with a copy to all other Non-Cash Out Parties, and requesting a meeting to seek agreed resolution of the dispute. If after 45 days an agreed resolution is not reached, a Non-Cash Out Party acting alone or with any other Non-Cash Out Party(ies) may petition the Court to resolve the dispute pursuant to the jurisdiction retained under this Decree. Failure to file such a petition with the Court within 120 days after Colorado receives the written notice of dispute shall constitute a waiver of the Disputed Matter, unless all affected Parties agree to extend such time. Grounds for dispute are limited to allegations that all or part of the Disputed Matter:

        (1)    included or resulted from an accounting error, or

        (2)    included or resulted from costs that were not, or would not be, Anticipated Future Response Costs, or

        (3)    included, resulted from, or would result from an expenditure for a response action that does not constitute a reasonable response necessary to comply with applicable statutes or regulations, or that was reasonably avoidable or unnecessary.

13

b.      To prevail in the dispute, the objecting Party or Parties has (have) the burden of proving one of the three grounds for dispute set forth in Paragraph 10(a) by clear and convincing evidence. If the Court finds that the objecting party has satisfied its burden as to the Disputed Matter, Colorado will reimburse the Joint Escrow Account for that part of the expenditure, will not apply Joint Escrow Account funds to that part of the expenditure, or the disputed Notice of Assessment will be decreased, as appropriate. No other remedy shall be available for a Disputed Matter. Disputes shall not delay the payment of expenditures from the Joint Escrow Account or continued work at the Site; however, the disputed portion of a Notice of Assessment shall not be due and payable while the Disputed Matter remains pending.

c.      No dispute under this Paragraph 10 shall be based on the allegation that a particular response action selected by Colorado is or is not or might not be consistent with the National Contingency Plan.

11.   Termination of Obligation to Pay Anticipated Future Response Costs or To Replenish Joint Escrow Account,

a.      The obligations of Colorado and the Non-Cash Out Parties to pay Anticipated Future Response Costs and/or to replenish the Joint Escrow Account will terminate when CDPHE issues a no further action determination, issues a radioactive materials license termination, accepts an institutional control or takes similar action that confirms that further remedial action is not required with respect to the ground water contamination detected in the monitoring wells on the Lower Terrace and Former Settling Pond Area.

b.      Within 30 days after the event that terminates the obligations of Colorado and the Non-Cash Out Parties to pay Anticipated Future Response Costs and/or to replenish the Joint Escrow Account, any money remaining in or due to the account will be distributed to Colorado and the Non-Cash Out Parties, allocated pursuant to the Negotiated Shares of Anticipated Future Response Costs set forth in Attachment D, subject to resolution of any Disputed Matters pursuant to Paragraph 10. Colorado shall receive any distribution that would have been allocated to the United States or to any Cash Out Party.

c.      After the termination of obligations pursuant to Paragraph 11(a), if

14

CDPHE, EPA, or a similar State or Federal regulatory entity requires further work necessary to address ground water contamination detected in the monitoring wells on the Lower Terrace and Former Settling Pond Area, any Response Costs incurred by Colorado to perform such further work shall be deemed Unanticipated Future Response Costs subject to the requirements of Paragraph 20 of this Decree.

12.      Federal Anti-Deficiency Act and State Fund Availability Limitation.  Payment by the United States pursuant to this Decree is subject to the availability of funds appropriated for such purpose.  No provision of this Decree shall be interpreted or constitute a commitment or requirement that the United States obligate or pay funds in contravention of the Anti-Deficiency Act, 31 U.S.C. § 1341, or other applicable appropriations laws.  Financial obligations of Colorado payable after the current fiscal year are contingent upon funds for that purpose being appropriated, budgeted, and otherwise made available.  No provision of this Decree shall be interpreted or constitute a commitment or requirement that Colorado indemnify another Party or encumber or pay funds in contravention of the limitations on indebtedness contained in the state constitution and shall not constitute a multiple fiscal year direct or indirect debt or other financial obligation of the State of Colorado within the meaning of section 20(4) of article X of the state constitution.

13.      Payment for Shares that Become Orphan Shares.  In the event that any one or more of the Non-Cash Out Parties fails to make any payment to the Joint Escrow Account as required under Paragraph 9 of this Decree because that Party has become insolvent, defunct, or legally unable to pay, the remaining Non-Cash Out Parties and Colorado will pay the deficiency in the proportions set forth in Paragraph 9 for replenishment of the Joint Escrow Account, such proportions however to be recomputed excluding the Party unable to pay in proportion to the remaining parties' previous allocations.  If Colorado fails to make a payment to the Joint Escrow Account as required under this Decree, no further Assessment may be made on the Non-Cash Out Parties until Colorado cures such failure.  If judicial action is taken among any Parties except the United States to collect any payment due under Paragraph 9, the prevailing party shall

15

be entitled to recover reasonable legal fees and costs. The obligations of Non-Cash Out Parties under this Decree shall not be affected in the event that any Cash Out Party defaults on its obligations under this Decree.

14.     Termination of Radioactive Materials License. Contemporaneous with the Effective Date of this Decree, or as soon thereafter as the Colorado School of Mines and CDPHE determine the appropriate scope of a license in the name of the School, CSMRI will apply to CDPHE to terminate or modify the CSMRI License and Colorado, through the Colorado School of Mines, will contemporaneously apply for a new, modified or transferred radioactive materials license or for the adoption of institutional controls as described in Paragraph D. If the Colorado School of Mines applies for or is issued a radioactive materials license or if institutional controls are adopted for any part of the Site by CDPHE, the United States, the Settling Private Parties and CSMRI do not reserve and expressly waive any claims or defenses that such application or issuance in and of itself establishes or is evidence that Response Costs incurred by Colorado were or were not incurred as part of a voluntary clean up or that Colorado is responsible for the liability of CSMRI. Notwithstanding the preceding sentence, the United States, the Settling Private Parties and CSMRI do reserve and expressly do not waive any claims or defenses that other facts and law, including Colorado and CSMRI actions prior to such application and issuance, establish or are evidence that Response Costs incurred by Colorado were or were not incurred as part of a voluntary clean up or that Colorado is responsible for the liability of CSMRI.

## V. COVENANTS AND RELEASES

15.     Settling Private Parties, United States, CSMRI and Colorado Covenants. Except as specifically provided in Section VI of this Decree, each Party covenants not to sue or take administrative action against any other Party pursuant to Sections 107(a) or 113 of CERCLA, 42 U.S.C. §§ 9607 or 9613, or any other provision of state or federal law, for Response Costs. These covenants extend only to the Parties and do not extend to any other person. With respect to

each Party, individually, each covenant is conditioned upon the satisfactory performance by such Party of all of its obligations and covenants under this Decree. These covenants not to sue shall take effect upon the Effective Date of this Decree.

16.    Releases by Colorado. Upon the Effective Date of this Decree, Colorado releases all claims, causes of action, suits, or demands of any kind whatsoever in law or in equity Colorado now has, may have had, or hereafter may have against the Settling Private Parties, the United States and CSMRI relating in any way to the CSMRI Site except as provided in the Reservation of Rights set forth in Paragraph 18 of this Decree and the Reservation of Rights to Seek Unanticipated Future Response Costs provided in Paragraph 20 of this Decree.  This release includes, but is not limited to, claims and causes of action pursuant to any Federal, State, or local law, regulation, or ordinance, or the common law, including but not limited to claims or causes of action for cost recovery, contribution, recoupment, indemnity, claims sounding in tort, claims arising under the common law, or claims or causes of action under Sections 106, 107, or 113 of CERCLA, 42 U.S.C. §§ 9606, 9607, or 9613, the Resource Conservation and Recovery Act and Solid Waste Disposal Act, 42 U.S.C. § 6901 *et seq.*, the Atomic Energy Act of 1954, 42 U.S.C. § 2011 *et seq.*, the Clean Water Act, 33 U.S.C. § 1215 *et seq.*, the Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*, the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*, and their regulations.

17.    Releases by Settling Private Parties, CSMRI and the United States. Upon the Effective Date of this Decree, the Settling Private Parties, CSMRI and the United States respectively release all claims, causes of action, suits, or demands of any kind whatsoever in law or in equity the Settling Private Parties, CSMRI and the United States now have, may have had, or hereafter may have against Colorado and each other relating in any way to the CSMRI Site except as provided in the Reservation of Rights set forth in Paragraph 19 of this Decree and the Reservation of Rights to Seek Unanticipated Future Response Costs set forth in Paragraph 20 of this Decree.  This release includes, but is not limited to, claims and causes of action pursuant to any Federal, State, or local law, regulation, or ordinance, or the common law, including but not

limited to claims or causes of action for cost recovery, contribution, recoupment, indemnity, claims sounding in tort, claims arising under the common law, or claims or causes of action under Sections 106, 107, or 113 of CERCLA, 42 U.S.C. §§ 9606, 9607, or 9613, the Resource Conservation and Recovery Act and Solid Waste Disposal Act, 42 U.S.C. § 6901 *et seq.*, the Atomic Energy Act of 1954, 42 U.S.C. § 2011 *et seq.*, the Clean Water Act, 33 U.S.C. § 1215 *et seq.*, the Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*, the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*, and their regulations.

## VI.  RESERVATION OF RIGHTS

18.    <u>Reservations of Rights by Colorado</u>.  Except as provided in Paragraph 28, Colorado reserves, and this Decree is without prejudice to, all rights it might have against the Settling Private Parties, CSMRI, the United States or any person with respect to the following matters:

        a.    Claims based on failure to meet a requirement of this Decree;

        b.    As to parties other than the United States, criminal liability;

        c.    Claims arising from any future arrangement for disposal or treatment of a hazardous substance, pollutant, or contaminant at the CSMRI Site by Settling Private Parties, CSMRI or the United States after entry of this Decree, other than at the direction of Colorado;

        d.    Claims for damages for injury to, destruction of, or loss of natural resources and for the costs of any natural resource damage assessments;

        e.    Claims for Unanticipated Future Response Costs, but only in accordance with and to the extent provided in Paragraph 20;

        f.    Claims raised in response to and arising out of the same circumstances as claims made by Settling Private Parties and/or the United States, pursuant to Paragraph 19 (Reservation of Rights) or Paragraph 20;

        g.    Any exercise of statutory or regulatory authority by CDPHE or other similar or successor State agency acting in a regulatory capacity to protect public health and environment, or any State agency acting in the capacity of natural resources trustee, except that

this Paragraph 18(g) shall not be construed to restrict the contribution protection provided in Paragraph 22, below.

To the extent that any reservation of rights under this Paragraph 18 depends on a Party's actions or failure to act, the reservation shall apply only with respect to the Party committing the action or failure to act.

19.     Reservation of Rights by the Settling Private Parties, CSMRI and the United States. Except as provided in Paragraph 28, the Settling Private Parties, CSMRI and the United States reserve, and this Decree is without prejudice to, all rights they or any of them might have against Colorado, each other or any other person with respect to the following matters:

      a.     Claims based on failure to meet a requirement of this Decree;

      b.     Criminal liability;

      c.     Claims arising from any future arrangement for disposal or treatment of a hazardous substance, pollutant, or contaminant at the CSMRI Site by Colorado or any other person after entry of this Decree;

      d.     Claims for damages for injury to, destruction of, or loss of natural resources and for the costs of any natural resource damage assessments;

      e.     Claims against other Parties for Unanticipated Future Response Costs, but only in accordance with and to the extent provided in Paragraph 20;

      f.     Claims against other Parties raised in response to and arising out of the same circumstances as claims made or rights exercised by Colorado pursuant to Paragraph 18 (Reservation of Rights) or Paragraph 20 (Reservation of Rights to Seek Recovery of Unanticipated Future Response Costs), or by any other Party pursuant to this Paragraph 19; and

      g.     Notwithstanding any other provision of this Decree, the United States on behalf of EPA and any federal natural resource trustee agency reserves, and this Decree is without prejudice to, and the covenants set forth in Paragraph 15 and releases set forth in Paragraph 17 shall not apply to, any and all rights, claims, causes of action, or authorities, including without limitation injunctive relief or administrative enforcement, the United States on behalf of EPA and any federal natural resource trustee agency has or may have against Colorado,

CSMRI, and/or the Settling Private Parties regarding the Site. This Paragraph 19(g) shall not be construed to restrict the contribution protection provided in Paragraph 22, below.

To the extent that any reservation of rights under this Paragraph 19 depends on a Party's actions or failure to act, the reservation shall apply only with respect to the Party committing the action or failure to act.

20.    Reservation of Rights to Seek Recovery of Unanticipated Future Response Costs.

a.    Notwithstanding any other provision of this Decree, Colorado reserves, and this Decree is without prejudice to, the right of Colorado to institute proceedings to seek Unanticipated Future Response Costs incurred after the Effective Date of this Decree against any Non-Cash Out Parties if Colorado incurs Unanticipated Future Response Costs totaling in excess of $250,000 (exclusive of any accrued interest) that are not reimbursed by insurance or future recoveries for Unanticipated Future Response Costs from CSMRI or entities not Parties to this Decree. For purposes of this Paragraph 20(a), appropriations or grants made by the State of Colorado shall not be deemed future recoveries from an entity not a Party to this Decree. Prior to instituting proceedings to seek additional Unanticipated Future Response Costs, Colorado and the remaining Non-Cash Out Parties will meet and confer to determine if the matter can be resolved without litigation. If such remaining Parties cannot agree, Colorado may demand payment. If payment is refused, Colorado may pursue a claim for such costs in a separate action or under the jurisdiction retained by this Court under this Decree, subject to the following requirements:

(i).    The Response Costs are Unanticipated Future Response Costs as defined by this Decree;

(ii).    The Response Costs are incurred to address public health risks or environmental harm identified or confirmed by CDPHE, EPA or other similar or successor Federal or State agency acting in a regulatory capacity to protect public health and environment either (1) to comply with standards set forth in Federal or State statutes or regulations or (2) to comply with any order or directive of such Federal or State regulatory agency;

(iii).    Colorado has made good faith best efforts to recover such

20

Response Costs pursuant to any applicable insurance policy in effect, such as Attachment E, Colorado's current insurance policy, but the Response Costs are not reimbursed pursuant to such claim; and

        (iv).    Colorado's recovery of any Unanticipated Future Response Costs is limited to such costs that cumulatively exceed $250,000 and are not reimbursed by insurance or future recoveries for Unanticipated Future Response Costs from entities not Parties to this Decree.

        b.    Except as provided in Paragraphs 14 and 28, the United States and Settling Private Parties also reserve, and this Decree is without prejudice to, the right to assert claims against Colorado, CSMRI or each other for Unanticipated Future Response Costs:

        (i)    in the event that Colorado asserts a claim under this Paragraph 20;

        (ii)    in the event that a governmental entity requires any of the Settling Private Parties or the United States to incur or reimburse Unanticipated Future Response Costs; or

        (iii)    in the event that any person other than a Party seeks to compel the United States or any of the Settling Private Parties to reimburse or incur Unanticipated Future Response Costs.

## VII. EFFECT OF SETTLEMENT; CONTRIBUTION PROTECTION

        21.    Effect of Settlement.  This Decree was negotiated and executed by the Parties in good faith and at arm's length and is a fair and equitable compromise of claims which were vigorously contested. Each Party has had the opportunity to obtain, and has obtained to the extent deemed appropriate, legal advice and counsel regarding this Decree. The Parties agree that no Party shall be deemed to be the drafter or author of this Decree, and in the event this Decree is subject to interpretation or construction by a court of law, such court shall not construe this Decree or any portion thereof against any Party as the drafter of this Decree. This Decree shall not constitute or be construed as an admission of liability by any Party, nor is it an admission or denial of any factual allegation or an admission of violation of any law, rule,

regulation, or policy by any of the Parties to this Decree. The provisions of this Decree shall bind and inure to the benefit of the Parties. Entry of this Decree does not in and of itself establish that the response actions Colorado has taken or will take in the Lower Terrace and Former Settling Pond Area are or are not voluntary.

22.     Contribution Protection. The Parties agree, and by entering this Decree the Court finds, that this Decree constitutes a judicially-approved settlement for purposes of section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and that the Settling Private Parties, CSMRI and the United States are entitled, as of the entry of this Decree, to protection from contribution actions or claims as provided by section 113(f)(2) of CERCLA, or as may otherwise be provided by law, including common law, for "matters addressed" in this Decree. The "matters addressed" in this Decree are all response actions taken or to be taken and all response costs incurred or to be incurred at or in connection with the Site, by Colorado or any other person other than EPA; provided, however, that if any Party exercises rights under the provisions of Paragraph 20, the "matters addressed" in this Decree will no longer include those response costs or response actions that are within the scope of the exercised provisions of Paragraph 20. No Cash-Out Party(ies) shall be subject to claims or proceedings by any other Party under the provisions in Paragraph 20. The "matters addressed" in this Decree shall not be limited by the provisions in Paragraph 20 as to any Cash-Out Party(ies).

VIII. MODIFICATION OF DECREE TERMS

23.     Modification of Decree Terms. With the exception of modifying the process for making and accounting for payments of Anticipated Future Response Costs as provided in Paragraph 7(c), changing the designation of agent as provided in Paragraph 27, and mutually agreed upon extensions of time, this Decree may be amended, modified, or supplemented only by a writing signed by each of the Parties and approved by the Court. Any Party may in writing waive any provision of this Decree to the extent such provision is for the benefit of the waiving Party. No action taken pursuant to this Decree by any Party shall be deemed to constitute a

22

waiver of any other Party's compliance with provisions of this Decree.

## IX. MISCELLANEOUS PROVISIONS

24.     Collection Actions against Non-Parties. Certain entities, not Parties to this
Decree, may have liability to Colorado, the Settling Private Parties and/or the United States for
payment or reimbursement of Past Response Costs or Anticipated Future Response Costs. If
Colorado collects such costs from non-Parties, the first $600,000 collected from such non-Parties
after January 31, 2012, net of Colorado's reasonable collection expenses and the Settling Private
Parties' and the United States' reasonable legal fees and expenses in connection with Colorado's
collection efforts incurred after January 31, 2012, shall be retained by Colorado. Any amount
collected above $600,000, net of Colorado's reasonable collection expenses and the Settling
Private Parties' and the United States' reasonable legal fees and expenses in connection with
discovery proceedings in Colorado's collection actions incurred after the date of this Decree,
shall be credited to Colorado and the Non-Cash Out Parties according to their respective
Negotiated Shares of Anticipated Future Response Costs as defined in Paragraph 7(a). If such a
Colorado collection proceeding ("Colorado Action") results in contribution action(s) being filed
against any Settling Private Party or the United States, the Party(ies) against whom such
contribution actions are brought will be entitled to be reimbursed for their reasonable legal fees
and expenses in defending such actions from the proceeds of all Colorado Actions instituted after
January 31, 2012 (other than this Action) as set forth in this Paragraph 24.

25.     Integration/Attachments. This Decree and its attachments constitute the
final, complete and exclusive agreement and understanding among the Parties with respect to
this Decree. The Parties acknowledge that there are no representations, agreements or
understandings other than those expressly contained in this Decree. The following attachments
are appended to and incorporated into this Decree:

> "Attachment A" is the map of the CSMRI Site, including the Lower Terrace Area
> and Former Settling Pond Area.

23

"Attachment B" is the list of entities that are excluded from the definition of "Affiliate" in paragraph 2(a).

"Attachment C" is a list of the Settling Private Parties.

"Attachment D" is the list of negotiated share percentages and negotiated settlement amounts for each Party.

"Attachment E" is the Colorado Insurance Policy.

26.    <u>Signatories and Service</u>. Each undersigned representative of a Party certifies that he or she is authorized to enter into the terms and conditions of the Decree and to execute and bind legally such Party to this document.

27.    <u>Designation of Agent</u>. Each Party shall identify on the attached signature page, the name and address of an agent who is authorized to accept notice under this Decree by mail on behalf of that Party with respect to all matters arising under or relating to this Decree. Any Party may change its designated agent for receiving notice by informing the other Parties' designated agents in writing.

28.    <u>Cash Out</u>.

a.    Within 90 days after the Effective Date of this Decree, any Settling Private Party and/or the United States may fully settle its liability for Response Costs by paying to Colorado, according to Paragraph 5, an amount equal to its negotiated share of the cash out settlement amount of $14,950,000 ("Negotiated Share of Cash Out Settlement"), as set forth in Attachment D to this Decree. Such Cash Out Parties will make no payments under Paragraph 4, 7, 9, or 13, will not share in any distribution of funds remaining in or due to the Joint Escrow Account under Paragraph 11 and will not share in any split of net funds recovered by Colorado under Paragraph 24. The Cash Out Parties shall not be subject to any claim or proceeding instituted by any Party under the provisions of Paragraph 20, or under the Reservation provisions of Paragraphs 18(e), 18(f), 19(e) or 19(f) of this Decree, but they are specifically subject to the Reservation provisions of Paragraphs 18(g) and 19(g) of this Decree. To be eligible to cash out

24

under this Paragraph 28(a), the Party must notify Colorado of its intent to cash out prior to the lodging of this Decree with the Court.

        b.     The Negotiated Share of Cash Out Settlement is paid to settle each Cash Out Party's liability for Response Costs. Each Cash Out Party's Negotiated Share of Anticipated Future Response Costs, as set forth in Attachment D, shall be reduced to zero (0) and Colorado's Negotiated Share of Anticipated Future Response Costs shall be increased in an amount equal to the total shares assigned to Cash Out Parties in Attachment D. In addition, as between the Parties, Cash Out Parties are assigned a zero (0) percent share of Unanticipated Future Response Costs. The Parties acknowledge the possibility that a Cash Out Party may incur or reimburse Unanticipated Future Response Costs due to, among other things: (i) exercise of any right reserved in Paragraphs 18(g) or 19(g); or (ii) a claim or action brought against a Cash Out Party by a non-Party that might not be barred by contribution protection as provided by 42 U.S.C. § 9613(f)(2) for matters addressed in this Decree despite good faith efforts to obtain or enforce such a bar. Notwithstanding any other provision in this Decree, the Parties agree that, as between them, responsibility for Unanticipated Future Response Costs incurred by or sought from any Cash Out Party should be determined in a manner consistent with Paragraphs 28(a) and (b), which are intended to resolve all liability of the Cash Out Parties with respect to Response Costs. Therefore, should any order, claim or action compel or seek to compel a Cash Out Party to incur or reimburse Unanticipated Future Response Costs, the Cash Out Parties reserve the right to assert contribution claims against the other Parties, in which case, as between the Parties, the Cash Out Parties' liability shall be deemed satisfied by their payments pursuant to Paragraph 28(a) and any allocation of Unanticipated Future Response Costs shall assign zero share to them. Nothing in this Paragraph 28 or otherwise or in this Decree shall be interpreted to increase the equitable allocation to any Non-Cash Out Party, or increase any amount to be paid by any Non-Cash Out Party, for any Unanticipated Future Response Costs.

        29.    <u>Preservation of Prior Settlements</u>. Certain Affiliates of some of the Settling Private Parties have previously entered into settlement agreements, including consent orders or decrees, related to the CSMRI Site. Nothing in this Decree shall modify or supersede in any way

the terms of such prior settlement agreements.  Rather, with respect to such Affiliates, this Decree establishes additional terms and conditions that will apply to any claims, causes of action, suits or demands of any kind whatsoever in law or in equity that might otherwise be permitted by the prior settlement agreements.

30.    Transfer of Site.  Colorado's obligations under this Decree shall survive the sale, donation, transfer or other disposal of all or part of the CSMRI Site.  Except for the potential transfer of land or an interest in land to the City of Golden for purposes of a bicycle or recreational path and any utility easements to the City of Golden, Colorado shall not transfer the CSMRI Site, or any interest in or portion thereof, prior to termination of the Parties' obligation to pay Anticipated Future Response Costs.  Upon any transfer by Colorado of the CSMRI Site or any interest in or portion thereof, Colorado shall require the transferee to waive, for itself and any successor owners of such interest, any claims it (or they) may have against the Parties to this Decree arising from environmental conditions at the Site resulting from activities at the Site during its years of operation.

31.    Limitation on Use of Payment Agreements

a.    Payment Agreements.  The Parties have agreed in this Decree, and the Court orders in approving this Decree, that the Parties will make certain payments as described in Paragraphs 4, 7, 9, and 28.  The specific amounts and/or allocated shares for all such payments are set out in Attachment D and Paragraphs 7(a) and 28(a) and (b).  Collectively, these agreements on payment and allocation are referred to as "Payment Agreements."

b.    Use of Payment Agreements.  The Payment Agreements are fully binding and enforceable as obligations under the specific Paragraphs of this Decree in which they are set out.

c.    Non-Use of Payment Agreements.  The Payment Agreements are made and included in this Decree solely as an accommodation to reach settlement and to avoid the cost of litigation.  Each Party denies liability for Response Costs or other claims at or relating to the Site.  The Payment Agreements are the result of arms-length negotiations and reflect

compromises of the Parties' claims and defenses in exchange for valuable consideration. The Payment Agreements shall not be a precedent for and shall not apply to any other claims arising under this Decree or otherwise, whether brought by a Party or a non-Party to this Decree, including but not limited to claims for Unanticipated Future Response Costs, claims pursuant to Paragraph 20, or claims or defenses asserted under a Reservation of Rights pursuant to Paragraph 18 or 19 (specifically including but not limited to claims for or relating to natural resource damages).

32.     United States' Exemption from Certain Defenses.  In any subsequent administrative or judicial proceeding initiated by the United States on behalf of EPA or any federal natural resource trustee agency for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, neither Colorado, CSMRI, nor the Settling Private Parties shall assert or maintain any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defense based upon any contention that the claims raised by the United States on behalf of EPA or any federal natural resource trustee agency in the subsequent proceeding were or should have been brought in the present case; provided, however, that nothing in this Paragraph affects the enforceability of Paragraphs 15, 16 or 17.

33.     Effect of Disapproval or Vacatur of Decree.  The State, CSMRI, Settling Private Parties and the United States consent to the entry of this Decree in the form presented and mutually agreed to by the parties without further notice.  If for any reason the Court should decline to approve or enter this Decree in the form presented and mutually agreed to by the Parties, or if approval or entry is subsequently vacated on appeal of such approval and entry, this Decree shall be void and the terms of this Decree may not be used as evidence in any litigation among the Parties.

SO ORDERED THIS _3/st_ DAY OF _December_ , 20_15_.

27

Signature Page for 2013 Consent Decree in Civil Action in U.S. District Court for District of Colorado, *State of Colorado v. United States of America, et al.*, regarding the CSMRI Site.

**FOR: STATE OF COLORADO**

February 19, 2013
Date

Name (print): John W. Suthers

Title: Attorney General

Address: Ralph L. Carr Judicial Center

1300 Broadway, 10th Floor

Denver, CO 80203

Agent to Accept Notice Under Consent Decree on Behalf of Above-Signed Party.

Name (print): Bernie Buescher

Title: Deputy Attorney General

Address: Ralph L. Carr Judicial Center

1300 Broadway, 6th Floor

Denver, CO 80203

Phone: 720-508-6165

Email: bernie.buescher@state.co.us

28

Signature Page for 2013 Consent Decree in Civil Action in U.S. District Court for District of Colorado, *State of Colorado v. United States of America, et al.*, regarding the CSMRI Site.

**FOR:  CHEVRON CORPORATION**

February 14, 2013
Date

Name (print):   Rick E. Hansen

Title:   Assistant Secretary

Address:   6001 Bollinger Canyon Rd.

San Ramon, CA 94583

Agent to Accept Notice Under Consent Decree on Behalf of Above-Signed Party.

Name (print):   Michael J. Steinbrecher

Title:   Senior Counsel

Address:   Chevron Corporation

6001 Bollinger Canyon Rd.

San Ramon, CA 94583

Phone:   925-842-9274

Email:   msteinbrecher e chevron.com

29

Signature Page for 2013 Consent Decree in Civil Action in U.S. District Court for District of Colorado, *State of Colorado v. United States of America, et al.*, regarding the CSMRI Site.

FOR:  INDUSTRIAL MINERA MEXICO,
S.A. de C.V.

February 13, 2013
Date

Name (print):  Alejo Francisco Manzo Díaz

Title:  Attorney in Fact

Address:  Campos Eliseos 400

Lomas de Chapultepec

Mexico City

C.P. 11000

Industrial Minera Mexico, S.A. de C.V. hereby gives notice that it intends to cash out pursuant to Paragraph 28 of the Consent Decree.

Agent to Accept Notice Under Consent Decree on Behalf of Above-Signed Party.

Name (print):  Alejo Francisco Manzo Díaz

Title:  Attorney in Fact

Address:  Campos Eliseos 400

Lomas de Chapultepec

Mexico City

C.P. 11000

Phone:  52-55-11-03-51-19

Email:  francisco.manzo@ mm.gmexico.com

30

Signature Page for 2013 Consent Decree in Civil Action in U.S. District Court for District of Colorado, *State of Colorado v. United States of America, et al.*, regarding the CSMRI Site.

FOR:  **MEXICANA de COBRE, S.A. de C.V.**

February 13, 2013
_____
Date

Name (print): Alejo Francisco Manzo Díaz

Title:  Attorney in Fact

Address:  Campos Eliseos 400

Lomas de Chapultepec

Mexico City

C.P. 11000

_____

Mexicana de Cobre, S.A. de C.V. hereby gives notice that it intends to cash out pursuant to Paragraph 28 of the Consent Decree.

Agent to Accept Notice Under Consent Decree on Behalf of Above-Signed Party.

Name (print):  Alejo Francisco Manzo Díaz

Title:  Attorney in Fact

Address:  Campos Eliseos 400

Lomas de Chapultepec

Mexico City

C.P. 11000

_____

Phone:  52-55-11-03-51-19

Email:  francisco.manzo@ mm.gmexico.com

31

Signature Page for 2013 Consent Decree in Civil Action in U.S. District Court for District of Colorado, *State of Colorado v. United States of America, et al.*, regarding the CSMRI Site.

**FOR: FREEPORT-MCMORAN CORPORATION**

March 8, 2012
Date

Name (print): L. Richards McMillan, II

Title: Senior Vice President

Address: Freeport-McMoRan Corporation

333 N. Central Ave.

Phoenix, AZ 85004

Freeport-McMoRan Corporation hereby gives notice that it intends to cash out pursuant to Paragraph 28 of the Consent Decree.

Agent to Accept Notice Under Consent Decree on Behalf of Above-Signed Party.

Name (print): L. Richards McMillan, II

Title: Senior Vice President

Address: Freeport-McMoRan Corporation

333 N. Central Ave.

Phoenix, AZ 85004

Phone: (602) 366-8114

Email: rick_mcmillan@fmi.com

32

Signature Page for 2013 Consent Decree in Civil Action in U.S. District Court for District of Colorado, *State of Colorado v. United States of America, et al.*, regarding the CSMRI Site.

**FOR:  BP AMERICA INC.**

1 MAY 2013
Date

Name (print):  ALBERT L. KELLER

Title:  VICE PRESIDENT

Address:  501 WESTLAKE PARK BLVD.
HOUSTON, TX  77079

John Hinge
Chairman and
President, BP America

BP America Inc. hereby gives notice that it intends to cash out pursuant to Paragraph 28 of the Consent Decree.

Agent to Accept Notice Under Consent Decree on Behalf of Above-Signed Party.

Name (print):  Marc Ferries

Title:  LCM O&C Portfolio Manager

Address:  201 Helios Way
Houston, TX  77079

Phone:  281-504-6506

Email:  marcus.ferries@bp.com

33

Signature Page for 2013 Consent Decree in Civil Action in U.S. District Court for District of Colorado, *State of Colorado v. United States of America, et al.*, regarding the CSMRI Site.

**FOR:  COTTER CORPORATION (N.S.L.)**

28 Feb 2013
Date

Name (print):  Kenneth J. Mushinski

Title:  President

Address:  7800 East Dorado Place

Suite 210

Greenwood Village, CO 80111

Cotter Corporation (N.S.L.) hereby gives notice that it intends to cash out pursuant to Paragraph 28 of the Consent Decree.

Agent to Accept Notice Under Consent Decree on Behalf of Above-Signed Party.

Name (print):  The Corporation Company

Title:  

Address:  1675 Broadway, Suite 1200

Denver, CO 80202

Phone:  303-629-2500

Email:  

34

Signature Page for 2013 Consent Decree in Civil Action in U.S. District Court for District of Colorado, *State of Colorado v. United States of America, et al.*, regarding the CSMRI Site.

**FOR: ELF AQUITAINE, INC.**

2/21/2013
Date

Name (print): James P. DeLess
Title: President
Address: 468 Thomas Jones Way
Exton, PA 19341

Elf Aquitaine, Inc. hereby gives notice that it intends to cash out pursuant to Paragraph 28 of the Consent Decree.

Agent to Accept Notice Under Consent Decree on Behalf of Above-Signed Party.

Name (print): Pat Spillman
Title: Senior Attorney
Address: Total Petrochemicals & Refining USA, Inc.
1201 Louisiana, Suite 1800
Houston, Texas 77002
Phone: 713 - 483 - 5364
Email: pat.spillman@total.com

36

Signature Page for 2013 Consent Decree in Civil Action in U.S. District Court for District of Colorado, *State of Colorado v. United States of America, et al.*, regarding the CSMRI Site.

**FOR: TERRA INDUSTRIES INC.**

FEB. 19, 2013

Date

Name (print): G. VAN VECSOR WOLF JR

Title: Outside Counsel

Address: SALMON, LEWIS + WELDON PLC
2850 E. CAMELBACK, SUITE 200
PHOENIX AZ 85016

Terra Industries Inc. hereby gives notice that it intends to cash out pursuant to Paragraph 28 of the Consent Decree.

Agent to Accept Notice Under Consent Decree on Behalf of Above-Signed Party.

Name (print): G. VAN VECSOR WOLF JR

Title: OF COUNSEL

Address: SALMON, LEWIS + WELDON PLC
2850 E. CAMELBACK, SUITE 200
PHOENIX AZ 85016

Phone: 602-801-9075

Email: VVW@SCWPLC.COM

36

Signature Page for 2013 Consent Decree in Civil Action in U.S. District Court for District of Colorado, *State of Colorado v. United States of America, et al.*, regarding the CSMRI Site.

**FOR:  EXXON MOBIL CORPORATION**

Date   2/25/13

Name (print):   Clifford L. Pearson

Title:   Manager, Major Projects

Address:   800 Bell St., 791L

Houston, TX 77002

Exxon Mobil Corporation hereby gives notice that it intends to cash out pursuant to Paragraph 28 of the Consent Decree.

Agent to Accept Notice Under Consent Decree on Behalf of Above-Signed Party.

Name (print):   Corporation Service Company

Title:

Address:   1560 Broadway, Suite 2090

Denver, CO 80202

Phone:   (303) 860-7052

Email:

37

Signature Page for 2013 Consent Decree in Civil Action in U.S. District Court for District of Colorado, *State of Colorado v. United States of America, et al.*, regarding the CSMRI Site.

FOR:  **COLORADO SCHOOL OF MINES RESEARCH INSTITUTE, NOW BY NAME CHANGE KNOWN AS TABLE MOUNTAIN RESEARCH CENTER**

_____5 Mar 13_____
Date

Name (print): Hugh W. Evans
Title: President of Board of Directors
Address: Table Mountain Research Center
1500 Illinois Street
Golden, CO 80401

Agent to Accept Notice Under Consent Decree on Behalf of Above-Signed Party.

Name (print): Lori Potter
Title: Attorney for TMRC
Address: Kaplan Kirsch + Rockwell
1675 Broadway, Suite 2300
Denver, CO 80202
Phone: 303-825-7000
Email: lpotter@kaplankirsch.com

38

Signature Page for 2013 Consent Decree in Civil Action in U.S. District Court for District of Colorado, *State of Colorado v. United States of America, et al.*, regarding the CSMRI Site.

**FOR: UNITED STATES OF AMERICA**

Sept. 9, 2013
Date

Name (print): DANIEL PINKSTON

Title: Attorney, Envtl. Defense Section

Address: ENRD, U.S. Dept of Justice
999 - 18th St. S. Terrace, Ste 370
Denver, CO 80202
303 - 844 - 1804
daniel.pinkston @ usdoj.gov

Agent to Accept Notice Under Consent Decree on Behalf of Above-Signed Party.

Name (print): SECTION CHIEF

Title: Envtl. Defense Section

Address: Envt. and Natural Resources Div.
U.S. Dept. of Justice
P.O. Box 7611 Wash. DC 20044

Phone: 202 - 514 - 2219

Email: _____

39

**Attachment A**



CSMRI Site- Area Within Black Boundary

Lower Terrace & Former
Settling Pond Area

CSMRI Site Boundaries

*Stoller*

S:\4349 CSMRI Flood Plain EA&RI\FS\Working Report Figures\Site_Boundaries v3.mxd PLD @ 4/23/12

**Attachment B**
**List of Entities Excluded From the Definition of Affiliate**

Akzo Nobel Paints, LLC
Akzo Nobel N.V.
Alumet Partnership
American Nuclear Corporation
Anadarko E&P Company LP (fka Union Pacific Resources Co.)
Anadarko Holding Company (fka Union Pacific Minerals, Inc., fka Rocky Mountain
    Energy Company)
The Anschutz Corporation
    On behalf of itself and its subsidiaries:
    Anschutz Mining Corporation, Anschutz Uranium Corp., and/or Metal Traders
    Overseas Corporation and/or Metal Traders, Inc.

Basic Incorporated
Bruel & Kjaer Sound & Vibration Measurement A/S

CBS Corporation
CCX, Inc. (fka Continental Copper & Steel Industries, Inc.)
Citigroup Global Markets Holdings, Inc.
Cleveland-Cliffs Iron Co.

Dravo Corporation

EG&G Idaho, Inc. (and Bechtel BWXT Idaho, LLC (BBWI), but only with respect to its
    respective involvement and/or successor relationships in and to the potential
    liability arising out of the research projects sponsored by EG&G Idaho, Inc., at
    the CSMRI site)
Earth Sciences, Inc.
Eaton Corporation
Ecolab, Inc., as successor in interest to Apollo Technologies, Inc.

FMC Corp.
Fluor Enterprises Inc., on behalf of Fluor Daniel and St. Joe Minerals Corporation

HBM, Inc.
HBM United Kingdom, Ltd.
Hanson, plc
Hecla Limited Inc. (fka Hecla Mining Co.)
Homestake Mining Company of California (fka Homestake Mining Co.)
Honeywell International Inc. (aka Allied Signal Inc.) and Bendix Field Engineering Corp.
Horseneck Holdings Limited; Watts, Griffis and McQuat Limited

**Consent Decree Attachment B**
**Page 1 of 2**

Huntington Ingalls Incorporated

Kennecott Utah Copper LLC (fka Kennecott Utah Copper Corporation)
Kellogg Brown & Root (California), Inc.
Kellogg Brown & Root LLC
Kellogg Energy Services, Inc.

LDS Test and Measurement
Lockheed Martin Corp. (fka Lockheed Corp.)
Lone Star Industries, Inc.

Marmon Corporation (fka Marmon Group, Inc., fka Cerro Marmon Corp., fka Cerro
    Corporation, fka Cerro De Pasco Corporation)
Millennium Inorganic Chemicals, Inc.
Morgan Stanley Smith Barney LLC

Northrop Grumman Corporation

Occidental Petroleum Corp.

P.W. Gillibrand Co.
Phibro Resources Corp.
Pioneer Uravan, Inc.

Rio Tinto Exploration Canada (fka Kennecott Canada Inc.)
Rio Tinto plc

Siemens Energy, Inc.
Southern Copper Corporation (fka Southern Peru Copper Corporation)

The S.W. Shattuck Chemical Co., Inc.

United Nuclear Corp.

Viacom, Inc.

Westinghouse Electric Company, LLC

**Consent Decree Attachment B**
Page **2** of **2**

### Attachment C
### Non-Exclusive List of Settling Private Parties

The entities listed below, all of their respective predecessors, successors and past and present Affiliates, all of the respective successors to such Affiliates (to the extent of their liability as successors), and all of such entities' respective officers, directors, agents and employees are "Settling Private Parties" as defined by Consent Decree Paragraph 2(t). "Settling Private Party" shall not include any entity identified on **Attachment B**.

**I.**
Chevron Corporation
Chevron Alpha Company
Chevron AP Holdings Limited
Chevron Canada Minerals Limited
Chevron Industries, Inc.
Chevron Minerals
Chevron Oil Company
Chevron Research Company (f/k/a California Research Corporation)
Chevron Research and Technology Company
Chevron Resources Company
Chevron U.S.A. Inc.
Chevron AP Holdings, Limited (f/k/a Dominion Gulf Company)
Gulf Minerals Resources
Gulf Oil Corporation
Chevron Global Energy, Inc. (f/k/a Gulf Research & Development Company)
Gulf Science & Technology Company
Chevron Mining Inc.
Union Oil Company of California
Molycorp Inc.
ChevronTexaco Global Energy Inc.

**II.**
Industrial Minera Mexico, S.A. De C.V.
Mexicana de Cobre, S.A. De C.V.
ASARCO Mexicana, S.A.

**III.**
Freeport-McMoRan Corporation
Freeport-McMoRan Copper & Gold Inc.
Allied Chemical Corporation
Amax Chemical Corporation
Amax Exploration, Inc.
Amax Lead Company
Amax Metals Recovery, Inc.

Amax Nickel Refining Company, Inc.
Amax Research & Development, Inc.
American Metal Climax, Inc.
Cemex Construction Materials of Florida, LLC
Chemetall Foote Corporation
Climax Molybdenum Company
Climax Uranium Company
Colorado Yampa Coal Company
Cyprus Amax Minerals Company
Cyprus Foote Mineral Company
Cyprus Industrial Minerals Company
Cyprus Mines Corporation
Cyprus Pima Mining Company
Horizon Resources, Inc.
Inspiration Consolidated Copper Company
Luzenac America, Inc.
Moffat County Mining, LLC
Mount Tolman Project
Mt. Emmons Mining Company
Phelps Dodge Exploration, Inc.
RAG Coal International AG
Shoshone Coal Corporation
Southwest Potash Corporation
Twentymile Coal, LLC
Western Nuclear, Inc.

**IV.**
BP p.l.c. (F/K/A BP Amoco p.l.c.)
BP America Inc.
BP Amoco p.l.c.
BP Products North America, Inc. (F/K/A Amoco Oil)
BP America Production Company (F/K/A Amoco Production Co.)
BP Corporation North America, Inc.
BP Company North America, Inc.
BP Amoco Company
Amoco Research Operating Company
Amoco Oil Company
Amoco Research Center
Amoco Minerals
Amoco Metals
Standard Oil Company, Inc.
Standard Oil Company of Ohio
Sohio Petroleum Company
Sohio Development Company
Sohio Oil Company
Kennecott Corporation

Kennecott Copper Corporation
Kennecott Exploration, Inc.
Kennecott Minerals Co.
Atlantic Richfield Company
Arco Chemical
Arco Coal
Bear Creek Mining Company
The Anaconda Company
Anaconda Mining
Anaconda Copper
International Smelting & Refining

**V.**
Cotter Corporation (N.S.L.)

**VI.**
Elf Aquitaine, Inc.
TexasGulf Inc.
TexasGulf Canada, Ltd.
TexasGulf Panama, Inc.
TexasGulf Sulphur Company
TexasGulf Minerals and Metals Company

**VII.**
Terra Industries Inc.
Inspiration Development Company
Inspiration Gold Incorporated
Terra Capital Holdings, Inc.
CF Industries Enterprises, Inc.
CF Industries, Inc.
CF Industries Holdings, Inc.

**VIII.**
Exxon Mobil Corporation
Exxon Coal and Minerals Company
Exxon Company
Exxon Corporation
Exxon Minerals Company
Humble Oil & Refining Company
Standard Oil Company of New Jersey
ExxonMobil Upstream Research Company (f/k/a Exxon Production Research Company)
ExxonMobil Research and Engineering Company (f/k/a Exxon Research & Engineering Company)
Imperial Oil Resources Limited (f/k/a Esso Resources Canada Limited)
Imperial Oil Limited
Exxon-Arco-Sohio Joint Committee

Superior Oil Company
Exxon Corporation, USA
ExxonMobil Oil Corporation
Mobil
Mobil Exploration and Producing North America, Inc.
Mobil Oil Corp.
Mobil Oil Corporation

### Negotiated Shares of Past Response Costs Settlement

| Party | Share of Past Response Costs Settlement |
|---|---|
| B.P. America Inc. | $902,000 |
| Chevron Corporation | $509,000 |
| Cotter Corporation | $75,000 |
| Elf Aquitaine, Inc. | $630,000 |
| Exxon Mobil Corporation | $537,000 |
| Freeport-McMoRan | $1,147,000 |
| Industrial Minera Mexico, S.A. de C.V. | $32,000 |
| Mexicana de Cobre, S.A. de C.V. | $117,000 |
| Terra Industries, Inc. | $107,000 |
| United States | $3,699,000 |
| **TOTAL** | **$7,755,000** |

This document is for settlement purposes only. It does not admit liability or any share of liability as to any party. It is specifically subject to Paragraphs E, 3 and 31 of Consent Decree.

**Consent Decree Attachment D**
Page 1 of 3

**Negotiated Shares of Anticipated Response Costs**

| Party | Percent Share of All Anticipated Response Costs | Dollar Share of Initial Payment of Anticipated Response Costs |
|---|---|---|
| B.P. America Inc. | 8.54% | $19,169 |
| Chevron Corporation | 6.22% | $13,961 |
| Cotter Corporation | .71% | $1,594 |
| Elf Aquitaine, Inc. | 5.96% | $13,378 |
| Exxon Mobil Corporation | 5.08% | $11,403 |
| Freeport-McMoRan | 10.86% | $24,376 |
| Industrial Minera Mexico, S.A. de C.V. | .30% | $673 |
| Mexicana de Cobre, S.A. de C.V. | 1.11% | $2,492 |
| Terra Industries, Inc. | 1.02% | $2,289 |
| United States | 40.2% | $90,233 |
| **Subtotal** | **80.00%** | **$179,568** |
| Colorado | 20.00% | $44,892 |
| **TOTAL** | **100.00%** | **$224,460** |

This document is for settlement purposes only. It does not admit liability or any share of liability as to any party. It is specifically subject to Paragraphs E, 3 and 31 of Consent Decree.

**Consent Decree Attachment D**
**Page 2 of 3**

### Negotiated Shares of Cash Out Settlement

| Party | Share of Cash Out Settlement |
|---|---|
| B.P. America Inc. | $1,670,214 |
| Chevron Corporation | $1,069,156 |
| Cotter Corporation | $139,018 |
| Elf Aquitaine, Inc. | $1,165,149 |
| Exxon Mobil Corporation | $993,127 |
| Freeport-McMoRan | $2,122,271 |
| Industrial Minera Mexico, S.A. de C.V. | $60,008 |
| Mexicana de Cobre, S.A. de C.V. | $217,028 |
| Terra Industries, Inc. | $198,025 |
| United States | $7,316,004 |
| **TOTAL** | **$14,950,000** |

This document is for settlement purposes only.  It does not admit liability or any share of liability as to any party.  It is specifically subject to Paragraphs E, 3 and 31 of Consent Decree.



# Advisory notice to policyholders regarding the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") regulations

No coverage is provided by this policyholder notice nor can it be construed to replace any provisions of your policy.  You should read your policy and review your declarations page for complete information on the coverages you are provided.

This notice provides information concerning possible impact on your insurance coverage due to directives issued by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

**Please read this Notice carefully.**

OFAC administers and enforces sanctions policy based on Presidential declarations of "national emergency".  OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons."  This list can be located on the United States Treasury's web site – http://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC restrictions.  When an insurance policy is considered to be such a blocked or frozen contract, no payments or premium refunds may be made without authorization from OFAC.  Other limitations on premiums and payments also apply.

U-GU-1041-A  (03/11)
Page 1 of 1

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

## Disclosure Statement


ZURICH®

It is our pleasure to present the enclosed policy to you
for presentation to your customer.

**INSTRUCTION TO AGENT OR BROKER:**

WE REQUIRE THAT YOU TRANSMIT THE ATTACHED/ENCLOSED DISCLOSURE STATEMENT TO THE CUSTOMER
WITH THE POLICY.

Once again, thank you for your interest, and we look forward to meeting your needs and those of your customers.

# Disclosure Statement



**ZURICH**

### NOTICE OF DISCLOSURE FOR AGENT & BROKER COMPENSATION

If you want to learn more about the compensation Zurich pays agents and brokers visit:

http://www.zurichnaproducercompensation.com

or call the following toll-free number:  (866) 903-1192.

This Notice is provided on behalf of Zurich American Insurance Company

and its underwriting subsidiaries.

# Z Choice™ Pollution Liability Declarations



**ZURICH**®

## STEADFAST INSURANCE COMPANY
Dover, Delaware
Administrative Offices - 1400 American Lane
Schaumburg, Illinois 60196-1056

> **THIS POLICY PROVIDES COVERAGE ON A DISCOVERY AND/OR CLAIMS-MADE AND REPORTED BASIS DEPENDING UPON THE COVERAGE LISTED AS PROVIDED BELOW.  PAYMENT OF DEFENSE COSTS ERODES THE LIMITS OF LIABILITY.  THE ITEMS BELOW MAY BE MODIFIED BY ENDORSEMENT.  READ THE DECLARATIONS, POLICY, AND ALL ENDORSEMENTS CAREFULLY.**

**Policy Number:**   EPC 9244196 00                    **Renewal of:**   NEW

**Item 1. Named Insured:**   THE STATE OF COLORADO ACTING BY AND THROUGH THE
BOARD OF TRUSTEES OF COLORADO SCHOOL OF MINES

**Address:**   1500 ILLINOIS STREET
GOLDEN, CO 80401-1843

**Item 2. Policy Period:**   From:  4/30/2012  To:  4/30/2022
12:01 A.M. Local time at the address shown in Item 1.

**Item 3. Limits of Liability:**   $25,000,000  Each Pollution Event Limit

$25,000,000  Aggregate Policy Limit

**Item 4. Deductible:**   $100,000   Each Pollution Event

**Item 5. Coverages:**

This policy provides coverage only with respect to the specific Insuring Agreements indicated below and as described in the Z Choice Pollution Liability policy, and/or any endorsements.  If the word YES appears in the PROVIDED column corresponding with an insuring agreement listed below, it means that such coverage is provided.  If the word NO appears or the space is blank or blacked out it means that such coverage is not provided.  Sub-limits are described in Section VI. of the policy.

| INSURING AGREEMENTS | PROVIDED | SUB-LIMIT / AGGREGATE | SEPARATE DEDUCTIBLE |
|---|---|---|---|
| **Coverage A: Cleanup Costs – Existing Pollution Event** | | | |
| 1.(a) On-Site First Party Discovery | NO | NO | NO |
| 1.(b) On-Site Third Party Liability | YES | NO | NO |
| 2.(a) Off-Site First Party Discovery | NO | NO | NO |
| 2.(b) Off-Site Third Party Liability | YES | NO | NO |
| **Coverage B: Bodily Injury or Property Damage – Existing Pollution Event** | | | |
| 1.(a) On-Site Bodily Injury | YES | NO | NO |
| 1.(b) On-Site Property Damage | YES | NO | NO |
| 2.(a) Off-Site Bodily Injury | YES | NO | NO |
| 2.(b) Off-Site Property Damage | YES | NO | NO |
| **Coverage C: Cleanup Costs – New Pollution Event** | | | |
| 1.(a) On-Site First Party Discovery | NO | NO | NO |
| 1.(b) On-Site Third Party Liability | NO | NO | NO |
| 2.(a) Off-Site First Party Discovery | NO | NO | NO |
| 2.(b) Off-Site Third Party Liability | NO | NO | NO |
| **Coverage D: Bodily Injury or Property Damage – New Pollution Event** | | | |
| 1.(a) On-Site Bodily Injury | NO | NO | NO |
| 1.(b) On-Site Property Damage | NO | NO | NO |
| 2.(a) Off-Site Bodily Injury | NO | NO | NO |
| 2.(b) Off-Site Property Damage | NO | NO | NO |
| **Coverage E: Natural Resource Damages** | | | |
| 1. Existing Pollution Event | YES | NO | NO |
| 2. New Pollution Event | NO | NO | NO |
| **Coverage F: Choice Coverage – Non-Owned Locations** | | | |
| 1.(a) On-Site Bodily Injury | YES | NO | NO |
| 1.(b) On-Site Property Damage | YES | NO | NO |
| 1.(c) On-Site Cleanup Costs | YES | NO | NO |
| 2.(a) Off-Site Bodily Injury | YES | NO | NO |
| 2.(b) Off-Site Property Damage | YES | NO | NO |
| 2.(c) Off-Site Cleanup Costs | YES | NO | NO |
| **Coverage G: Choice Coverage – Transportation of Materials** | | | |
| 1. Bodily Injury | NO | NO | NO |
| 2. Property Damage | NO | NO | NO |
| 3. Cleanup Costs | NO | NO | NO |

**Item 6. Delimitation Date:**    04/30/2012

**Item 7. Retroactive Date:**    N/A

**Item 8. Policy Premium:**    $427,758

**Item 9. Notice to Us:**    All notices shall be sent to:

Zurich North America - Specialties Environmental Claims
P.O. Box 968041
Schaumburg, IL 60196-8041
Fax: (866) 255-2962
Email: usz_zurich_environmental@zurichna.com
or such other address of which we notify the Named Insured above in writing

**Item 10.  Broker:**    ENVIRONMENTAL RISK AGENCY LLC

1627 W MAIN STREET, SUITE 285

BOZEMAN, MT 59715-4011



# Schedule of Forms and Endorsements

| Form/Endorsement Title | Form Number |
|---|---|
| Z-Choice Pollution Liability Declarations | STF-EPC-D-100-A CW (10/09) |
| Z-Choice Pollution Liability | STF-EPC-100-B CW (03/08) |
| Additional Named Insured | STF-EPC-115-A CW (03/08) |
| Choice of Law | STF-EPC-120-A CW (11/07) |
| Fines & Penalties Endorsement (Sub-Limit of Liability) | STF-EPC-133-A CW (11/07) |
| Nuclear Exclusion | STF-EPC-143-A CW (11/07) |
| Schedule of Covered Locations with Material Change in Use/Operations Exclusion | STF-EPC-151-A CW (11/07) |
| Minimum Earned Premium Endorsement | STF-EPC-173-A CW (04/08) |
| Maintenance, Upgrades, Improvements or Installations Endorsement | STF-EPC-189-A CW (07/08) |
| Z Choice Coverage F:  Non Owned Locations (Blanket) | STF-EPC-192-B CW (03/11) |
| Deed Restrictions and Land Use Controls Exclusion | STF-EPC-217-A CW (08/10) |
| Known Pollution Event Schedule Third Party Bodily Injury, Property Damage, Governmentally Mandated Cleanup Costs  and Natural Resource Damages With Excluded Pollution Events | STF-EPC-MAN-1 CW (04/12) |
| Pollution Event Definition – Including Radioactive Waste and Materials | STF-EPC-MAN-2 CW (02/12) |
| Broad Named Insured | STF-EPC-MAN-3 CW (02/12) |
| Correction Endorsement | STF-EPC-MAN-4 CW (02/12) |
| Construction Related Activities and Subsurface Activities Exclusion – Cleanup Costs and Natural Resource Damages | STF-EPC-MAN-5 CW (04/12) |
| Important Notice | STF-GU-199-B (01/09) |
| Disclosure of Important Information Relating To Terrorism Risk Insurance Act | U-GU-630-C CW (12/07) |
| Cap on Losses from Certified Acts of Terrorism | U-GU-767-A CW (01/08) |
| Advisory Notice to Policyholders | U-GU-1041-A (03/11) |

# Z Choice Pollution Liability

**ZURICH**®

This policy provides coverage on a discovery and/or claims-made and reported basis depending upon the insuring agreements specifically listed as provided in Item 5 of the Declarations. A "pollution event" must be first "discovered" and/or a "claim" must be first made against an "insured" during the "policy period" and such "discovery" or "claim" must be reported to us in writing during the "policy period" or during an applicable extended reporting period. Notice of a "potential claim" is not a "claim" and does not trigger coverage under the policy.

This policy has certain unique provisions and requirements that may be different from other policies the "insured" may have purchased. Coverage is provided only if the word YES appears in the column marked PROVIDED in the schedule set forth in Item 5 of the Declarations. The payment of "claim expenses", including defense costs, reduces the Limits of Liability set forth in Item 3 of the Declarations. If the applicable Limits of Liability are exhausted, we shall not be liable for "claim expenses" or for any "loss", "cleanup costs", "natural resource damages" or "other loss" which would otherwise be covered under this policy. Read the entire policy carefully including any endorsements thereto to determine rights, duties, and what is and is not covered.

Throughout this policy, the words we, us and our refer to the company providing this insurance as identified in the Declarations. Words and phrases that appear in quotation marks have special meaning. Refer to DEFINITIONS (Section III).

In consideration of the payment of premium and the "named insured's" undertaking to pay the Deductible as described herein, in reliance upon the statements made during the application process and in the Application all of which are made a part hereof, and subject to the Limits of Liability of this insurance as set forth in Item 3 of the Declarations, and the exclusions, conditions and other terms of this policy, we agree with the "named insured" as follows:

## I.   INSURING AGREEMENTS

THESE COVERAGES ONLY APPLY IF AND TO THE EXTENT SPECIFICALLY LISTED AS PROVIDED IN ITEM 5 OF THE DECLARATIONS

### COVERAGE A: CLEANUP COSTS – EXISTING POLLUTION EVENT

1.  On-Site

    (a) First Party Discovery

    We will pay "cleanup costs" to the extent resulting from an "existing pollution event" on, at or under a "covered location", if that "existing pollution event" is first "discovered" during the "policy period" and the "discovery" is reported to us in writing during the "policy period" or any applicable extended reporting period.

    (b) Third Party Liability

    We will pay "cleanup costs" that an "insured" is legally obligated to pay as a result of a "claim" resulting from an "existing pollution event" on, at, or under a "covered location", provided the "claim" is first made against the "insured" during the "policy period", and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

    Unless covered under any other insuring agreement specifically listed as provided in Item 5 of the Declarations, we shall have no obligation to pay any "cleanup costs" attributable to any irritant, contaminant or pollutant that is outside the boundaries of a "covered location".

2.  Off-Site

    (a) First Party Discovery

    We will pay "cleanup costs" to the extent resulting from an "existing pollution event" that migrates beyond the boundaries from a "covered location", if that "existing pollution event" is first "discovered" during the "policy

period" and the "discovery" is reported to us in writing during the "policy period" or any applicable extended reporting period.

(b) Third Party Liability

We will pay "cleanup costs" that an "insured" is legally obligated to pay as a result of a "claim" resulting from an "existing pollution event" that migrates beyond the boundaries from a "covered location", provided the "claim" is first made against the "insured" during the "policy period", and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

Unless covered under any other insuring agreement specifically listed as provided in Item 5 of the Declarations, we shall have no obligation to pay any "cleanup costs" attributable to any irritant, contaminant or pollutant that is on, at or under a "covered location".

## COVERAGE B: BODILY INJURY OR PROPERTY DAMAGE – EXISTING POLLUTION EVENT

1. On-Site

(a) Bodily Injury

We will pay "loss" that an "insured" is legally obligated to pay as a result of a "claim" for "bodily injury":

(i) sustained by a person while within the boundaries of a "covered location"; and

(ii) resulting from an "existing pollution event" on, at or under such "covered location";

provided the "claim" is first made against the "insured" during the "policy period", and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

(b) Property Damage

We will pay "loss" that an "insured" is legally obligated to pay as a result of a "claim" for "property damage":

(i) to property within the boundaries of a "covered location"; and

(ii) resulting from an "existing pollution event" on, at or under such "covered location";

provided the "claim" is first made against the "insured" during the "policy period", and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

Unless covered under any other insuring agreement specifically listed as provided in Item 5 of the Declarations, we shall have no obligation to pay any "loss" attributable to any irritant, contaminant or pollutant that is outside the boundaries of a "covered location".

2. Off-Site

(a) Bodily Injury

We will pay "loss" that an "insured" is legally obligated to pay as a result of a "claim" for "bodily injury":

(i) sustained by a person while beyond the boundaries of a "covered location", and

(ii) resulting from an "existing pollution event" that migrates beyond the boundaries from such "covered location";

provided the "claim" is first made against the "insured" during the "policy period", and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

(b) Property Damage

We will pay "loss" that an "insured" is legally obligated to pay as a result of a "claim" for "property damage":

(i) to property beyond the boundaries of a "covered location"; and

(ii) resulting from an "existing pollution event" that migrates beyond the boundaries from such "covered location";

provided the "claim" is first made against the "insured" during the "policy period", and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

Unless covered under any other insuring agreement specifically listed as provided in Item 5 of the Declarations, we shall have no obligation to pay any "loss" attributable to any irritant, contaminant or pollutant that is on, at or under a "covered location".

## COVERAGE C: CLEANUP COSTS – NEW POLLUTION EVENT

1. <u>On-Site</u>

   (a) First Party Discovery

   We will pay "cleanup costs" to the extent resulting from a "new pollution event" on, at or under a "covered location", if that "new pollution event" is first "discovered" during the "policy period" and the "discovery" is reported to us in writing during the "policy period" or any applicable extended reporting period.

   (b) Third Party Liability

   We will pay "cleanup costs" that an "insured" is legally obligated to pay as a result of a "claim" resulting from a "new pollution event" on, at, or under a "covered location", provided the "claim" is first made against the "insured" during the "policy period", and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

   Unless covered under any other insuring agreement specifically listed as provided in Item 5 of the Declarations, we shall have no obligation to pay any "cleanup costs" attributable to any irritant, contaminant or pollutant that is outside the boundaries of a "covered location".

2. <u>Off-Site</u>

   (a) First Party Discovery

   We will pay "cleanup costs" to the extent resulting from a "new pollution event" that migrates beyond the boundaries from a "covered location", if that "new pollution event" is first "discovered" during the "policy period" and the "discovery" is reported to us in writing during the "policy period" or any applicable extended reporting period.

   (b) Third Party Liability

   We will pay "cleanup costs" that an "insured" is legally obligated to pay as a result of a "claim" resulting from a "new pollution event" that migrates beyond the boundaries from a "covered location", provided the "claim" is first made against the "insured" during the "policy period", and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

   Unless covered under any other insuring agreement specifically listed as provided in Item 5 of the Declarations, we shall have no obligation to pay any "cleanup costs" attributable to any irritant, contaminant or pollutant that is on, at or under a "covered location".

## COVERAGE D: BODILY INJURY OR PROPERTY DAMAGE – NEW POLLUTION EVENT

1. <u>On-Site</u>

   (a) Bodily Injury

   We will pay "loss" that an "insured" is legally obligated to pay as a result of a "claim" for "bodily injury":

   (i) sustained by a person while within the boundaries of a "covered location"; and

   (ii) resulting from a "new pollution event" on, at or under such "covered location";

   provided the "claim" is first made against the "insured" during the "policy period", and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

   (b) Property Damage

   We will pay "loss" that an "insured" is legally obligated to pay as a result of a "claim" for "property damage":

   (i) to property within the boundaries of a "covered location"; and

   (ii) resulting from a "new pollution event" on, at, or under such "covered location";

provided the "claim" is first made against the "insured" during the "policy period", and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

Unless covered under any other insuring agreement specifically listed as provided in Item 5 of the Declarations, we shall have no obligation to pay any "loss" attributable to any irritant, contaminant or pollutant that is outside the boundaries of a "covered location".

2.  Off-Site

(a)  Bodily Injury

We will pay "loss" that an "insured" is legally obligated to pay as a result of a "claim" for "bodily injury":

(i)   sustained by a person while beyond the boundaries of a "covered location"; and

(ii)  resulting from a "new pollution event" that migrates beyond the boundaries from such "covered location";

provided the "claim" is first made against the "insured" during the "policy period", and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

(b)  Property Damage

We will pay "loss" that an "insured" is legally obligated to pay as a result of a "claim" for "property damage":

(i)   to property beyond the boundaries of a "covered location"; and

(ii)  resulting from a "new pollution event" that migrates beyond the boundaries from such "covered location";

provided the "claim" is first made against the "insured" during the "policy period", and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

Unless covered under any other insuring agreement specifically listed as provided in Item 5 of the Declarations, we shall have no obligation to pay any "loss" attributable to any irritant, contaminant or pollutant that is on, at or under a "covered location".

## COVERAGE E: NATURAL RESOURCE DAMAGES

1.  Existing Pollution Event

We will pay "natural resource damages" that an "insured" is legally obligated to pay as a result of a "claim" for injury to or destruction of "natural resources" resulting from an "existing pollution event" on, at, under or that migrates beyond the boundaries from a "covered location",  provided the "claim" is first made against the "insured" during the "policy period" and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

2.  New Pollution Event

We will pay "natural resource damages" that an "insured" is legally obligated to pay as a result of a "claim" for injury to or destruction of "natural resources" resulting from a "new pollution event" on, at, under or that migrates beyond the boundaries from a "covered location",  provided the "claim" is first made against the "insured" during the "policy period" and the "claim" is  reported to us in writing during the "policy period" or any applicable extended reporting period.

## II.  DEFENSE

We shall have the right and duty to assume the adjustment, defense and settlement of any "claim" to which an insuring agreement specifically listed as provided in Item 5 of the Declarations applies.  "Claim expenses" reduce the applicable Limits of Liability set forth in Item 3 of the Declarations as described in LIMITS OF LIABILITY AND DEDUCTIBLE (Section VI.).

If permitted by applicable law, we shall have the right to appoint one legal counsel to represent and/or defend one or more of the "insureds" who are or may be involved in a "claim" to which this insurance applies.  In the event an "insured" is entitled by law to select independent counsel to represent and/or defend an "insured" at our expense, the attorney's fees and all other litigation expenses we must pay to that counsel are limited to "reasonable legal costs".  Furthermore, an "insured" may at any time waive any right it may have to select independent counsel.

Our duty to adjust, defend and settle any and all "claims", pending and future, to which an insuring agreement specifically listed as provided in Item 5 of the Declarations applies, ends when the remaining applicable Limits of Liability have been tendered into court or have been exhausted by payment of "loss", "cleanup costs", "natural resource damages" or "other loss".

## III. DEFINITIONS

**A.** **"Bodily injury"** means any physical injury, sickness, disease, mental anguish or emotional distress sustained by any person, including death resulting therefrom.

**B.** **"Claim"** means a written demand or written notice received by the "insured" alleging liability or responsibility on the part of the "insured". "Claim" does not include a "potential claim" that was reported in a prior policy period as described in CLAIM PROVISIONS (Section VII., B. NOTICE OF POTENTIAL CLAIM), that has become a "claim" during the "policy period".

**C.** **"Claim expenses"** means:

1. Fees charged by an attorney designated by:

   a. Us; or

   b. The "insured" with our prior written consent, provided such fees are "reasonable legal costs"; and

2. All other fees, costs and expenses resulting from the adjustment, defense, settlement and appeal of a "claim" if incurred by us, or by or on behalf of the "insured" with our written consent, including interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay (including an offer of judgment), or deposited in court the amount available for the judgment under the policy.

"Claim expenses" does not include the salaries or expenses of regular employees of ours or the "insured".

**D.** **"Cleanup costs"** means:

1. Reasonable and necessary costs, charges and expenses incurred in the investigation, removal, remediation (including associated monitoring), neutralization or immobilization of contaminated soil, surface water, groundwater, or other contamination including "emergency expense", but excluding any costs, charges or expenses:

   (a) incurred by the "insured" to confirm "discovery" (except as specifically provided for in Section III. D.4. below); or

   (b) to achieve regulatory standards at a "covered location" that are stricter than those necessary for the actual or intended use of such location as set forth in the Application or in the Schedule of Covered Locations endorsement.

2. Where real property or improvements thereto are damaged in the course of performing the activities described in Section III., D.1. above, the lesser of the actual cost to repair, or the actual cash value of, such real property or improvements (as determined based upon the condition of the property or improvements thereto immediately prior to such damage) but excluding any:

   (a) damage caused by the underlying "pollution event"; or

   (b) costs, charges or expenses for improvements or betterments, including, but not limited to, those arising from compliance with any law that was not applicable to (including by operation of any grandfather provision contained in any such law) or not enforced against the property before it was so damaged; and

3. "Claim expenses" in connection with a "claim" for "cleanup costs"; or

4. With respect to "discovery", only those "reasonable legal costs" incurred with our prior written consent.

"Cleanup costs" does not include "loss" for "property damage", "natural resource damages" or any other compensation for injury to or destruction of "natural resources".

**E.** **"Covered location"** means, and is limited to, that property listed in the Schedule of Covered Locations endorsement to the extent therein specifically described, including, without limitation, by street address, lot and block reference, metes and bounds, or by a combination of these or any other substantially equivalent land description methods, current as of the effective date of coverage for any such property.

F. **"Delimitation date"** means the date set forth in Item 6 of the Declarations or in the Schedule of Covered Locations endorsement as applicable.

G. **"Discovered"** or **"discovery"** means discovery by a "responsible insured" of a "pollution event" in amounts or concentrations that exceed allowable levels or concentrations established under "governmental authority".

H. **"Emergency expense"** means costs, charges and expenses incurred to avoid an actual imminent and substantial endangerment to the public health or welfare or the environment.

I. **"Existing pollution event"** means a "pollution event" that commenced on or after the "retroactive date" and prior to the "delimitation date".

J. **"Fungus"** or "fungi" means any:

    1. Form or type of mold, mushroom or mildew,

    2. Other fungal structure, and

    3. Volatile organic compounds, mycotoxins, allergenic proteins or other substances or gases produced by or arising out of any mold, mushroom, mildew, fungal structure or "spores".

K. **"Governmental authority"** means applicable federal, state, or local statutes, regulations, ordinances or orders.

L. **"Insured"** means:

    1. The "named insured"; and

    2. Any current or former principal, partner, officer, director, employee, member or manager (in the case of a limited liability company) or leased personnel of a "named insured", while acting within the scope of their employment or written agreement with such "named insured".

M. **"Insured contract"** means a contract or agreement listed in a Schedule of Insured Contracts endorsement to this policy, if any.

N. **"Loss"** means:

    1. Compensatory damages, whether awarded by a court in a judgment or paid in settlement for:

        (a) "Bodily injury" which may include costs for medical monitoring but only when such medical monitoring is a direct result of physical injury; or

        (b) "Property damage" which may include diminution in property value and stigma damage to property, but only when such diminution in value or stigma damage is a direct result of physical injury to such property; and

    2. "Claim expenses" in connection with a "claim" for Section III., N.1.(a) and N.1.(b) above.

"Loss" does not include "other loss".

O. **"Microbial substance"** means any substance that reproduces through release of "spores" or the splitting of cells including but not limited to bacteria, viruses, "fungus(i)", protozoa, chlamydiae, or rickkettsaie, whether or not the substance is living.

P. **"Named insured"** means the person or entity set forth in Item 1 of the Declarations, and any other person or entity listed in a Named Insured endorsement to the policy, if any.

Q. **"Natural resources"** means land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States, any State or local government, any foreign government, any Indian tribe or, if such resources are subject to a trust restriction on alienation, any member of an Indian tribe.

R. **"Natural resource damages"** means the sum of:

    1. Reasonable and necessary direct costs, including such costs of assessment and replacement required by applicable "governmental authority" to restore the "natural resources" to their baseline condition as they existed prior to the "pollution event";

    2. "Use value" of injury to or destruction of "natural resources" between the time of a "pollution event" and restoration of the "natural resources" to the extent injured by the "pollution event"; and

3. "Claim expenses" incurred in connection with a "claim" for injury to or destruction of "natural resources".

"Natural resource damages" does not include "cleanup costs" or "loss" for "property damage".

**S.** **"New pollution event"** means a "pollution event" that first commences on or after the "delimitation date".

**T.** **"Other loss"** has the meaning given in a Choice Coverage endorsement to this policy, if any. "Other loss" does not include "loss".

**U.** **"Policy period"** means the period set forth in Item 2 of the Declarations or:

    1. Any shorter period arising from:

        (a) Cancellation or termination of this policy; or

        (b) With respect to a specific "covered location" the deletion of such "covered location" from this policy by us upon the "named insured's" written request; or

    2. As otherwise expressly provided in an endorsement.

**V.** **"Pollution event"** means the discharge, dispersal, release, or escape of any solid, liquid, gaseous or thermal irritant, contaminant or pollutant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste into or upon land, or any structure on land, the atmosphere, or any watercourse or body of water including groundwater.

**W.** **"Potential claim"** means a "new pollution event" that an "insured" reasonably expects may result in a "claim".

**X.** **"Property damage"** means:

    1. Physical injury to or destruction of tangible property including the resulting loss of use thereof; or

    2. Loss of use of tangible property that has not been physically injured or destroyed.

"Loss" for "property damage" does not include "cleanup costs", "natural resource damages" or any other compensation for injury to or destruction of "natural resources".

**Y.** **"Reasonable legal costs"** means attorneys fees, costs, charges, and all other litigation expenses in connection with the defense of a "claim" or negotiation of cleanup standards in connection with "discovery", limited to rates we actually pay to counsel we retain in the ordinary course of business in the defense of similar "claims" or negotiation of similar matters in the community where the "claim" arose or is being defended or the "discovery" was made or is being negotiated; provided that we shall pay such rates and amounts only to the extent that and so long as they are evidenced to be reasonable and necessary attorney fees, costs, charges, and expenses. We may exercise the right to require that such counsel have certain minimum qualifications with respect to legal competency including experience in defending "claims" or negotiating in connection with a "discovery" similar to the one pending against or involving an "insured" and to require such counsel to have errors and omissions insurance coverage. It is a condition precedent to our obligation to pay any "reasonable legal costs" that an "insured" agree and be responsible for counsel responding to our requests for information regarding the "claim", "discovery" or any other matter in a timely and comprehensive manner.

**Z.** **"Responsible insured"** means a "named insured's" principal, partner, director, officer, member or manager (in the case of a limited liability company), or employee with responsibility for compliance, environmental or legal affairs, or risk management.

**AA.** **"Retroactive date"** means the date set forth in Item 7 of the Declarations, or any applicable endorsement, which is the earliest date that a "pollution event" can commence for coverage to be provided under the policy. If no entry appears or the words NOT APPLICABLE or N/A appear in the corresponding space of Item 7 of the Declarations then a "retroactive date" shall not apply.

**BB.** **"Spore"** or **"spores"** means any reproductive body produced by or arising out of any "fungus(i)".

**CC.** **"Termination of coverage"** means, for the purpose of EXTENDED REPORTING PERIODS (Section V.), the effective date of:

    1. Cancellation or nonrenewal of this policy by the "named insured", or cancellation or nonrenewal of this policy by us other than for fraud or material misrepresentation, change in use of, or operations conducted at, the "covered location", or nonpayment of premium; or

2.  Deletion of a "covered location" from this policy by us upon the "named insured's" written request but only with respect to such "covered location".

**DD. "Underground storage tank"** means any tank in existence at a "covered location" as of the inception date of the policy or installed thereafter, including associated underground piping connected thereto, that has at least ten (10) percent of its volume, or any associated piping, below the ground.

**EE. "Use value"** means the value of the "natural resources" to the public attributable to the direct use of the services provided by such "natural resources", provided, however, that no aesthetic or historic use shall be considered in the determination of such value.

## IV. EXCLUSIONS

This insurance does not apply to "claims", "cleanup costs", "loss", "natural resource damages" or "other loss" based upon, arising out of, or to the extent comprised of:

### A. Asbestos and Lead

Any asbestos-containing material or lead-based paint which are or were part of any fixtures, buildings or improvements on, at or under the "covered location". However, this exclusion does not apply to "cleanup costs" to the extent attributable to asbestos-containing materials or lead-based paint in the soil or groundwater.

### B. Contractual Liability

Any liability assumed by an "insured" under any contract or agreement. However, this exclusion does not apply to liability:

1.  For "cleanup costs", "loss", "natural resource damages" or "other loss" that would have attached to an "insured" by operation of law in the absence of such contract or agreement; or

2.  That is specifically assumed in an "insured contract" but only to the extent that any indemnity or contractual liability assumed thereby is consistent with liability expressly covered under, and not otherwise excluded from coverage by, this policy.

### C. Financial Assurance

Any obligation to demonstrate financial assurance or financial responsibility, or to meet any financial assurance or financial responsibility requirements under any federal, state or local law. However, this exclusion does not apply to any such obligation to the extent specifically provided in an endorsement to this policy, if any.

### D. Fines, Penalties and Punitive Damages

Any fines, penalties, or punitive, exemplary or multiple damages.

### E. Known Pollution Event

Any "pollution event" known to a "responsible insured" prior to the effective date of the applicable insuring agreement listed as provided in Item 5 of the Declarations of this policy, unless such "pollution event" was disclosed to us in writing and listed on a Known Pollution Event Schedule and/or Disclosed Documents endorsement and provided that such "pollution event" is not otherwise excluded under the policy.

### F. Known Underground Storage Tanks

Any "underground storage tank", whether active, inactive or abandoned, known to any "responsible insured" unless listed on a Scheduled Underground Storage Tank endorsement to this policy, if any.

### G. Maintenance, Upgrades, Improvements or Installations

Any costs, charges or expenses for maintenance, upgrade or improvement of, or installation of any control to, any property or processes on, at, within or under a "covered location" even if such maintenance, upgrade, improvement or installation is required:

1.  By "governmental authority"; or

2.  As a result of "cleanup costs", "loss", "natural resource damages" or "other loss" otherwise covered under the policy.

**H. Microbial Substance**

Any "microbial substance".

**I. Naturally Occurring Substance**

Any naturally occurring substance in its unaltered form, or altered solely through naturally occurring processes or phenomena. However, this exclusion does not apply to the extent that an "insured" demonstrates that the naturally occurring substance:

1.  Exceeds amounts or concentrations naturally present on, at, under or surrounding the "covered location", and

2.  Was the result of a discharge, dispersal, release or escape of such naturally occurring substance.

**J. Owned Property**

"Property damage" to property that is owned or rented by or leased to, the "insured".

**K. Related Persons and Organizations**

Any "claim" made:

1.  By an "insured" against any other "insured"; or

2.  Against an "insured" by an organization or individual:

    a.  That wholly or partially controls, owns, operates or manages an "insured"; or

    b.  That is wholly or partially controlled, owned, operated or managed by the "insured".

**L. War**

1.  War, including undeclared or civil war;

2.  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3.  Insurrection, rebellion, revolution or usurped power, or action taken by any government, sovereign or other authority in hindering or defending against any of these.

**M. Wrongful Acts or Deliberate Non-Compliance**

Any:

1.  Knowingly wrongful act, or

2.  Deliberate non-compliance with any "governmental authority", administrative complaint, notice of violation, notice letter, or instruction of any governmental agency or body,

by or at the direction of a "responsible insured".

**N. Workers' Compensation and Injury as a Consequence of Employment**

1.  Any obligation of the "insured" that is owed, in whole or in part, under a workers compensation, disability benefits, unemployment compensation or any similar law;

2.  Injury to any "insured" if such injury occurs during and in the course of employment;

3.  Injury to the spouse, child, parent, brother or sister of any "insured" as a consequence of such "insured's" employment; or

4.  Any obligation of an "insured" for indemnity or contribution to another because of "loss" or "other loss" arising out of such injury in the course of employment.

## V. EXTENDED REPORTING PERIODS

**A. RENEWAL OF COVERAGE**

Provided that the "named insured" has renewed this policy, the "named insured" shall be entitled to a provisional extended reporting period of sixty (60) days (at no additional charge) within which to report:

1. "Discovery" during the final thirty (30) days of the "policy period", such provisional extended reporting period to commence upon the date of "discovery"; or

2. A "claim" that is first made against the "insured" during the final thirty (30) days of the "policy period", such provisional extended reporting period to commence upon the date the "claim" is made against the "insured".

Any "discovery" or "claim" reported to us in writing during the provisional extended reporting period shall be deemed to have been made during the "policy period" and shall be subject to the remaining Limits of Liability for the "policy period", if any.

## B. TERMINATION OF COVERAGE

Only with respect to "claims" seeking payment of "cleanup costs", "loss", "natural resource damages" or "other loss" to which an insuring agreement specifically listed as provided in Item 5 of the Declarations applies, the "named insured" shall be entitled to:

1. An automatic extended reporting period of sixty (60) days (at no additional charge) upon "termination of coverage".

2. Purchase an optional extended reporting period of up to three (3) years in duration commencing when the automatic extended reporting period ends, provided the "named insured":

   (a) makes a written request to us for such optional extended reporting period within sixty (60) days after "termination of coverage"; and

   (b) pays the additional premium when due. The charge for such optional extended reported shall not exceed one hundred percent (100%) of the total premium for the policy as set forth in Item 8 of the Declarations plus any additional premium described in an endorsement to the policy, if any.

At the commencement of any such optional extended reporting period, the entire premium shall be considered earned, and in the event the optional extended reporting period is terminated before its expiration for any reason, we shall not return any portion of the premium paid. If such additional premium is paid when due, the optional extended reporting period may not be canceled by us, provided that all other terms and conditions of the policy are met.

3. Any "claim" first made against the "insured" and reported to us in writing during the automatic extended reporting period or, as applicable, the optional extended reporting period shall be deemed to have been made and reported on the last day of the "policy period" and coverage shall apply under this policy provided that:

   (a) The "pollution event" commenced on or after the "retroactive date" and before the end of the "policy period"; and

   (b) The "named insured" has not purchased any other insurance to replace coverage provided by this policy; and

   (c) The "claim" is otherwise covered under the terms and conditions of this policy; and

   (d) The "cleanup costs", "loss", "natural resource damages" or "other loss" resulting from such "claim" will be subject to the remaining Limits of Liability for this policy, if any; and

   (e) Notwithstanding CONDITIONS (Section VIII.), OTHER INSURANCE, and Section V., B.3 (b), above, the insurance provided for a "claim" first reported during the automatic extended reporting period or the optional extended reporting period is excess over any other valid and collectible insurance available under policies in force during the automatic or optional extended reporting periods.

## VI. LIMITS OF LIABILITY AND DEDUCTIBLE

### A. EACH POLLUTION EVENT LIMIT

Subject to the Aggregate Policy Limit, the most we will pay for all "cleanup costs", "loss", "natural resource damages" or "other loss" arising out of the same, continuous or repeated "pollution event" or series of related "pollution events" is the Each Pollution Event Limit set forth in Item 3 of the Declarations.

We shall not be obligated to pay any "cleanup costs", "loss", "natural resource damages" or "other loss", or undertake or continue the defense of any "claim", pending or future, after the Each Pollution Event Limit has been tendered into court or exhausted by payments for "cleanup costs", "loss", "natural resource damages" or "other loss".

**B. AGGREGATE POLICY LIMIT OF LIABILITY**

The most we will pay for all "cleanup costs", "loss" and "other loss" to which this insurance applies is the Aggregate Policy Limit set forth in Item 3 of the Declarations.

**C. SUB-LIMIT OF LIABILITY/AGGREGATE SUB-LIMIT**

If a sub-limit of liability is shown in Item 5 of the Declarations corresponding with a specific insuring agreement or in an endorsement to this policy, then, subject to the Each Pollution Event Limit and Aggregate Policy Limit set forth in Item 3 of the Declarations and the corresponding Aggregate Sub-Limit, such sub-limit of liability is the most we will pay for all "cleanup costs", "loss", "natural resource damages" or "other loss" as applicable, arising from the same, continuous or repeated "pollution event" or series of related "pollution events" to which the specific insuring agreement or endorsement applies. The corresponding Aggregate Sub-Limit is the most we will pay for all "cleanup costs", "loss", "natural resource damages" or "other loss", as applicable, under the terms of the insuring agreement or endorsement to which that Aggregate Sub-Limit corresponds.

The sub-limit of liability is not in addition to and will erode the Each Pollution Event Limit and the Aggregate Policy Limit set forth in Item 3 of the Declarations. If the Each Pollution Event Limit and/or Aggregate Policy Limit has been reduced to an amount which is less than the sub-limit of liability corresponding with a specific insuring agreement or in an endorsement, the lesser of the remaining Aggregate Policy Limit or remaining Each Pollution Event Limit is the most that will be available for payment of "cleanup costs", "loss", "natural resource damages" or "other loss" as applicable, to which to which that insuring agreement or endorsement applies.

**D. DEDUCTIBLE**

We will pay "cleanup costs", "loss", "natural resource damages" or "other loss" to which this insurance applies in excess of the Deductible set forth in Item 4 or Item 5 (corresponding with an insuring agreement specifically listed as provided) of the Declarations or as set forth in an endorsement to this policy, if any. The Deductible is the "named insured's" obligation and applies to all "cleanup costs", "loss", "natural resource damages", and "other loss" arising from the same, continuous or repeated "pollution event" or series of related "pollution events". The Deductible does not erode the Limits of Liability. We may advance payment for "cleanup costs", "loss", "natural resource damages" or "other loss" within the Deductible. The "named insured" shall promptly reimburse us for advancing any element of such "cleanup costs", "loss", "natural resource damages" or "other loss" paid by us within the Deductible.

If an "insured" agrees with us to use non-binding mediation to resolve a "claim" for which a defense has been provided and such "claim" is resolved thereby, the Deductible shall be reduced by 50% for that "claim" only, subject to a maximum reduction of $25,000.

**E. MULTIPLE INSUREDS OR CLAIMANTS, MULTIPLE COVERAGES, MULTIPLE POLICY PERIODS, CLAIMS ARISING FROM POTENTIAL CLAIMS, AND CLAIMS REPORTED IN THE EXTENDED REPORTING PERIOD**

**1. MULTIPLE INSUREDS OR CLAIMANTS**

The inclusion of more than one "insured" in the "discovery" of a "pollution event" or in the making of a "claim" regarding the same "pollution event" shall not increase the Limits of Liability set forth in Item 3 of the Declarations. Nor shall the "discovery" of a "pollution event" or the making of "claims" by more than one person or organization increase the Limits of Liability stated in the Declarations.

**2. MULTIPLE COVERAGES**

If the same, continuous or repeated "pollution event" or series of related "pollution events" is covered under more than one insuring agreement specifically listed as provided in Item 5 of the Declarations, only a single Each Pollution Event Limit shall apply to all "cleanup costs", "loss", "natural resource damages" or "other loss" arising from such "pollution event" or series of related "pollution events". Furthermore, if more than one Deductible is applicable, only the highest Deductible shall apply to all "cleanup costs", "loss", "natural resource damages", or "other loss" arising from such "pollution event" or series of related "pollution events".

**3. MULTIPLE POLICY PERIODS**

If we or an affiliate have issued pollution liability coverage to the "named insured" for the "covered location" in one or more consecutive and uninterrupted policy periods, and:

(a) a "pollution event" or series of related "pollution events" that is first reported to us in accordance with all of the terms and conditions of this policy takes place over the "policy period" and one or more subsequent policy periods; and/or

(b) a "claim" for "cleanup costs", "loss", "natural resource damages" or "other loss" is first made against the "insured" during the "policy period" and reported to us in accordance with all of the terms and conditions of this policy; and/or

(c) a "pollution event" is first "discovered" during the "policy period" and reported to us in accordance with all of the terms and conditions of this policy;

all "claims", "cleanup costs", "loss", "natural resource damages", and "other loss" arising out of the same, continuous or repeated "pollution event" or series of related "pollution events" whether reported during the "policy period" or during a subsequent policy period shall be subject to the Limits of Liability and Deductible corresponding with this policy.

### 4.   CLAIMS ARISING FROM POTENTIAL CLAIMS

A "potential claim" which subsequently becomes a "claim" shall be subject to the Limits of Liability corresponding to the policy period in effect when the "potential claim" was reported to us in accordance with CLAIMS PROVISIONS (Section VII., Paragraph B. NOTICE OF POTENTIAL CLAIM).

### 5.   CLAIMS REPORTED IN THE EXTENDED REPORTING PERIOD

The extended reporting periods shall not serve to increase or reinstate the Limits of Liability set forth in Item 3 of the Declarations.  The Limits of Liability shall be those that remain at the end of the "policy period".

## VII. CLAIM PROVISIONS

### A.   NOTICE OF DISCOVERY OR CLAIM

In the event of a "discovery" or "claim", the "insured" shall give written notice to us as soon as possible containing particulars sufficient to identify an "insured" and reasonably obtainable information including:

1.   The time, place, location, and a detailed explanation of the "pollution event" including, as applicable, the date of "discovery" or the date the "insured" received the "claim";

2.   The names and addresses of any injured parties and available witnesses;

3.   Any and all investigative or engineering reports, data or information about the "pollution event", "cleanup costs", "loss", "natural resource damages" or "other loss"; and

4.   Any and all other relevant information about the "pollution event", "claim", "cleanup costs", "loss", "natural resource damages" or "other loss".

If a "claim" is made against an "insured", the "insured" shall immediately forward to us every demand, notice, summons, complaint, order or other process or legal papers received by an "insured" or its representatives.

### B.   NOTICE OF POTENTIAL CLAIM

If during the "policy period" the "insured" first becomes aware of a "potential claim", the "insured" may provide written notice to us containing particulars sufficient to identify an "insured" and providing all of the following information:

1.   The cause of the "new pollution event" if known or suspected, including any potential cause;

2.   The time, place, location, and details of the "new pollution event" including how and when the "insured" first became aware of the "potential claim";

3.   The names and addresses of any actually or potentially injured parties or damaged property, and available witnesses, if and to the extent reasonably available;

4.   Any and all investigative or engineering reports, data or information about the "potential claim", and any other information containing "cleanup costs", "loss", "natural resource damages" or "other loss" that may result; and

5.   Any other relevant information about the "potential claim", "cleanup costs", "loss", "natural resource damages" or "other loss".

If all of the foregoing information is provided to us in writing during the "policy period" and the "potential claim" subsequently becomes a "claim" made against the "insured" and reported to us during any renewal policy, any applicable extended reporting period, or within five (5) years after the later of the end of any such policy or extended reporting period, such "claim" shall be deemed, for the purposes of this insurance, to have been made on the date on which written notice of the "potential claim" was first received by us and shall be subject to the terms, conditions and Limits of Liability applicable to the policy in effect as of such date.

We may elect to investigate any "potential claim" which is reported to us. Any costs associated with the investigation of a "potential claim" prior to a "claim" being made will not be considered "claim expenses". These costs shall not be applied towards reducing the applicable Deductible, and are in addition to the Limits of Liability and shall be borne by us.

### C. NOTICE TO US

All "discovery", "claims" and "potential claims" shall be reported to us in writing at the address shown in Item 9 of the Declarations.

### D. SETTLEMENT

The "insured" shall not settle any "claim" without our written consent. If we recommend a settlement, the "insured" shall have the opportunity to concur, such concurrence not to be unreasonably withheld or denied. If we recommend a settlement that is acceptable to a claimant for a total amount in excess of the applicable Deductible and the "insured" refuses to concur with such settlement, then our liability for "cleanup costs", "loss", "natural resource damages", and "other loss" shall be limited to that portion of the recommended settlement and the "claim expenses" incurred as of the date of the "insured's" refusal, which exceed the Deductible and fall within the Limit of Liability.

### E. VOLUNTARY PAYMENTS, ADMISSIONS OR ASSUMPTIONS OF LIABILITY

No costs, charges or expenses shall be incurred or paid or liability admitted or assumed by an "insured" without our written consent, which shall not be unreasonably withheld, delayed or denied.

Notwithstanding the foregoing, an "insured" may incur such "emergency expense" as reasonably necessary to prevent or mitigate "cleanup costs", "loss", "natural resource damages" or "other loss", provided the "insured" provides written notice to us within ninety-six (96) hours after any portion of such "emergency expense" is incurred.

## VIII. CONDITIONS

### A. APPRAISAL

If we and the "insured" disagree as to the value of real property or improvements thereto in connection with "cleanup costs" (Section III. DEFINITIONS, paragraph D.2) or the amount of "other loss" for Coverages H, I, and J (only if specifically listed as provided in Item 5 of the Declarations), either party may make written demand for an appraisal of the value of the property or the amount of "cleanup costs" or "other loss". In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of "cleanup costs" or "other loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

1.   Pay its chosen appraiser; and

2.   Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we retain our right to deny coverage for "cleanup costs" or "other loss" as applicable.

### B. ASSIGNMENT

Assignment of interest under this policy shall not bind us unless and until our consent is endorsed thereon, which consent shall not be unreasonably withheld, delayed or denied.

### C. AUDIT AND INSPECTION

We shall be permitted upon reasonable prior notice to audit the "insured's" books and records at any time during the "policy period" and within three (3) years after the final termination of this policy, as far as they relate to the subject matter of the policy and any "cleanup costs", "loss", "natural resource damages" or "other loss" for which

payment may be made under the policy. We shall also be permitted, upon reasonable prior notice, to inspect, sample and monitor on a continuing basis any "covered location" and operations conducted thereon. Neither our right to make inspections, sample and monitor, nor the actual undertaking thereof, nor any report thereon shall constitute an undertaking, on behalf of us or others, to determine or warrant that a "covered location" or operation is safe, healthful or conforms to acceptable engineering practice or is in compliance with any law, rule or regulation. We will not manage or exercise control over any "covered location" or operation.

**D. BANKRUPTCY**

Bankruptcy or insolvency of an "insured" will not relieve us of our obligations to an "insured" under this policy nor increase our obligations including, but not limited to, those with respect to any Deductible amount. However, if we have advanced any payment for "cleanup costs", "loss", "natural resource damages" or "other loss" within the Deductible pursuant to LIMITS OF LIABILITY AND DEDUCTIBLE (VI., paragraph D), then any such payments to the extent not reimbursed to us shall reduce the Limits of Liability. Furthermore, this condition shall not impair our ability to assert any defense on behalf of an "insured".

**E. CANCELLATION**

This policy may be canceled by the "named insured" by surrender to us or by mailing to us written notice stating when thereafter cancellation shall be effective.

This policy may be canceled by us by mailing to the "named insured" at the address set forth in Item 1 of the Declarations, a notice stating when thereafter such cancellation shall be effective. We may cancel this policy for the following reasons only:

1. Fraud or material misrepresentation;

2. Any "insured's" material failure to comply with the terms, conditions or contractual obligations under this policy including failure to pay the Deductible when due;

3. A material change in use of, or operations conducted at, any "covered location"; or

4. Nonpayment of premium.

The mailing of notice as aforesaid shall be sufficient proof of notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the "policy period". Delivery of such written notice either by the "named insured" or by us shall be equivalent to mailing. Notice of pending cancellation will be provided not less than: (a) sixty (60) days prior to the effective date of cancellation for any "insured's" failure to comply with the terms, conditions or contractual obligations under this policy including failure to pay the Deductible when due, or change in use of, or operations conducted at the "covered location" that materially increases risks to which this insurance applies; (b) thirty (30) days prior to the effective date of cancellation for fraud or material misrepresentation; and (c)  ten (10) days prior to the effective date of cancellation for nonpayment of premium.

If we cancel, subject to any minimum earned premium that may apply, the return premium will be calculated on a pro rata basis. If the "named insured" cancels, subject to any minimum earned premium that may apply, there may be no return premium or the return premium may be less than pro rata.

**F. CHANGES**

The terms of this policy shall not be waived or changed, except by endorsement issued to form a part of this policy.

**G. CHOICE OF LAW**

In the event an "insured" and we dispute the meaning, interpretation or operation of any term, condition, definition or provision of this policy resulting in litigation, arbitration or other form of dispute resolution, the "insured" agrees with us that the law of the State of New York shall apply without giving effect to any conflicts or choice of law principles. In the event the "insured" agrees with us to resolve the dispute by arbitration, any such arbitration shall be in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect when such agreement is reached.

**H. COOPERATION**

The "insured" agrees with us to assist and cooperate in the fulfillment of the policy's terms, including the investigation, adjustment, defense or settlement of any "claim" or in connection with the "discovery" of any

"pollution event". Such cooperation may include participating at meetings; testifying at hearings, depositions and trials; and securing evidence. The "insured" shall be allowed $250 per day but no more than $5,000 in total allowable expenses for compensation to its principals, partners, officers, directors, employees or members or managers for personally attending any such meetings, hearings or depositions at our request. These allowable expenses shall not reduce the applicable Limits of Liability and Deductible set forth in Item 3 of the Declarations.

In addition, all "insureds" shall cooperate with us in the pursuit of any coverage that may be available from other insurers and/or under other insurance policies for "claim expenses", "cleanup costs", "loss", "natural resource damages" or "other loss", covered under this policy.

## I.  DECLARATIONS

By acceptance of this policy, the "named insured" agrees that the statements in the Declarations, and those made during the application process and in the Application are its agreements and representations, that this policy is issued in reliance upon the truth of such statements and representations and that this policy embodies all agreements existing between the "named insured" and us relating to this insurance.

## J.  HEADINGS

The descriptions in the headings of this policy are solely for convenience and form no part of the policy terms and conditions.

## K.  OTHER INSURANCE

1.  The insurance provided under this policy is primary insurance, except as otherwise provided in connection with any extended reporting period, or where stated in an endorsement to apply in excess of, or contingent upon the absence of, other insurance. When this insurance is primary and the "insured" has other insurance which is stated to be applicable to the "cleanup costs", "loss", "natural resource damages" or "other loss" on an excess basis, the amount of our liability under this policy shall not be reduced by the existence of such excess insurance.

2.  When this insurance is excess, we shall have no duty to defend the "insured" against any "claim" if any other insurer has a duty to defend the "insured" against such "claim". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers. When this insurance is excess over other insurance, we will pay only our share of the amount of "cleanup costs", "loss", "natural resource damages" or "other loss" if any, that exceeds the sum of:

    a.  The total amount that all such other insurance would pay for the "cleanup costs", "loss", "natural resource damages" or "other loss" in the absence of this insurance; and

    b.  The total of all deductible and self-insured amounts under all that other insurance.

3.  When both this insurance and other insurance apply to the "cleanup costs", "loss", "natural resource damages" or "other loss" on the same basis, whether primary, excess or contingent, we shall not be liable under this policy for a greater proportion of the "cleanup costs", "natural resource damages" " or "other loss" than the amount set forth in Item 3 of the Declarations or the amount resulting from the following contribution methods, whichever is lesser:

    a.  Contribution by equal shares - Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the "cleanup costs", "loss", "natural resource damages" or "other loss" remains, whichever occurs first; or

    b.  Contribution by limits - each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

## L.  SEPARATION OF INSUREDS

Except with respect to the Limits of Liability and any rights and duties specifically assigned to the "named insured" set forth in Item 1 of the Declarations, this insurance applies:

1.  As if each "named insured" were the only "named insured"; and

2.  Separately to each "insured" against whom a "claim" is made.

Misrepresentation, concealment, breach of condition or violation of any duty under this policy by one "insured" shall not prejudice the interest of coverage for another "insured" under this policy, except where an "insured" is a

parent, subsidiary, or affiliate of the "named insured" set forth in Item 1 of the Declarations. For purposes of the immediately preceding sentence, an "affiliate" is any company or entity that is in control of, controlled by, or under common control with the "named insured". "Control" (including the terms "controlled by" and "under common control with") as used herein includes, but is not limited to, the possession, directly or indirectly and whether acting alone or in conjunction with others, of the authority to direct or cause the direction of the management or policies of a company or entity. A voting interest of twenty five percent (25%) or more creates a rebuttable presumption of control.

## M. SOLE AGENT

The "named insured" set forth in Item 1 of the Declarations shall act on behalf of all "insureds" for all purposes, including but not limited to the payment of Deductible, payment or return of premium, receipt and acceptance of any endorsement issued to form a part of this policy, giving and receiving notice of cancellation or nonrenewal, and the exercise of the rights provided in EXTENDED REPORTING PERIODS (Section V.)

## N. SUBROGATION

In the event of any payment under this policy, we shall be subrogated to all of an "insured's" rights of recovery against any person or organization, including any rights to contribution from any other insurer. An "insured" shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. No "insured" shall do anything to impair, prejudice or waive such rights.

Any recovery obtained through subrogation, after expenses incurred in such subrogation are deducted by the party bearing the expense, shall be applied proportionately to the "insured" and us for actual payments as a result of judgment, settlement or defense of a "claim", or "cleanup costs" with respect to the "discovery" of a "pollution event".

## O. THIRD PARTY BENEFICIARIES

No third party beneficiaries are created as a result of this policy. This policy creates no rights by or on behalf of any third parties. We have no obligation under this policy to any third party whatsoever and specifically we have no obligation to make payment to anyone except the "insured".

# Additional Named Insured


**ZURICH**®

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EPC 9244196 00 | 4/30/2012 | 4/30/2022 | 4/30/2012 | 37509000 | --- | --- |

**Named Insured and Mailing Address:**

THE STATE OF COLORADO ACTING BY AND
THROUGH THE BOARD OF TRUSTEES OF
COLORADO SCHOOL OF MINES
1500 ILLINOIS STREET
GOLDEN, CO 80401-1843

**Producer:**

ENVIRONMENTAL RISK AGENCY LLC
1627 W MAIN STREET, SUITE 285
BOZEMAN, MT 59715-4011

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Z Choice Pollution Liability - Claims Made and Reported Coverage**

In consideration of the payment of premium and the Deductible by the "named insured" and in reliance upon the statements made in the application process and in the Application all of which are made a part hereof, we agree, subject to all the terms, exclusions and conditions of the policy, that the person(s) or entity(s) listed below is(are) a "named insured" pursuant to DEFINITIONS, Section III., paragraph P. Named Insured:

Named Insured:

| Name: | Address: | Retroactive Date: | Delimitation Date: |
|---|---|---|---|
| Colorado School of Mines Research Institute (CSMRI) | 1500 Illinois Street<br>Golden, CO 80401 | N/A | 04/30/2012 |
| I.<br>Chevron Corporation<br>Chevron Alpha Company<br>Chevron AP Holdings Limited<br>Chevron Industries, Inc.<br>Chevron Minerals<br>Chevron Oil Company<br>Chevron Research Company (f/k/a California Research Corporation)<br>Chevron Research & Technology Company<br>Chevron Resources Company<br>Chevron U.S.A. Inc.<br>Chevron AP Holdings, Ltd. (f/k/a Dominion Gulf Company)<br>Gulf Minerals Resources<br>Gulf Oil Corporation<br>Chevron Global Energy, Inc. (f/k/a Gulf Research & Development Company)<br>Gulf Science & Technology Company<br>Chevron Mining Inc.<br>Union Oil Company of California<br>Molycorp Inc. | 6001 Bollinger Canyon Road, T2224<br>San Ramon, CA 94583 | N/A | 04/30/2012 |

| | | | |
|---|---|---|---|
| ChevronTexaco Global Energy Inc. | | | |
| II.<br>Industrial Minera Mexico, S.A. De C.V.<br>Mexicana de Cobre, S.A. De C.V.<br>ASARCO Mexicana, S.A. | IMM-850528-1UO<br>Campos Eliseos No. 400 Oficina 1102<br>Col. Lomas de Chapultepec<br>Mexico, D.F.<br>C.P. 1100 | N/A | 04/30/2012 |
| III.<br>Freeport-McMoRan Corporation<br>Freeport-McMoRan Copper & Gold Inc.<br>Amax Exploration, Inc.<br>Amax Metals Recovery, Inc.<br>Amax Research & Development, Inc.<br>American Metal Climax, Inc.<br>Cemex Construction Materials of Florida, LLC<br>Chemetall Foote Corporation<br>Climax Molybdenum Company<br>Climax Uranium Company<br>Colorado Yampa Coal Company<br>Cyprus Amax Minerals Company<br>Cyprus Mines Corporation<br>Cyprus Pima Mining Company<br>Inspiration Consolidated Copper Company<br>Moffat County Mining, LLC<br>Mt. Emmons Mining Company<br>Phelps Dodge Exploration, Inc.<br>RAG Coal International AG<br>Shoshone Coal Corporation<br>Southwest Potash Corporation<br>Twentymile Coal, LLC<br>Western Nuclear, Inc. | 333 North Central Avenue<br>Phoenix, AZ 95004 | N/A | 04/30/2012 |
| IV.<br>BP p.l.c. (F/K/A BP Amoco p.l.c.)<br>BP America Inc.<br>BP Amoco p.l.c.<br>BP Products North America, Inc. (F/K/A Amoco Oil)<br>BP America Production Company (F/K/A Amoco Production Co.)<br>BP Corporation North America, Inc.<br>BP Company North America, Inc.<br>BP Amoco Company<br>Amoco Research Operating Company<br>Amoco Oil Company<br>Amoco Research Center<br>Amoco Minerals<br>Amoco Metals<br>Standard Oil Company, Inc.<br>Standard Oil Company of Ohio<br>Sohio Petroleum Company<br>Sohio Development Company<br>Sohio Oil Company<br>Kennecott Corporation<br>Kennecott Copper Corporation<br>Kennecott Exploration, Inc.<br>Kennecott Minerals Co.<br>Atlantic Richfield Company<br>Arco Chemical | 4 Centerpointe Drive<br>La Palma, CA 90263-1066 | N/A | 04/30/2012 |

| | | | |
|---|---|---|---|
| Arco Coal<br>Bear Creek Mining Company<br>The Anaconda Company<br>Anaconda Mining<br>Anaconda Copper<br>International Smelting & Refining | | | |
| **V.**<br>Cotter Corporation (N.S.L.) | 7800 East Dorado Place, Suite 210<br>Greenwood, CO 80111 | N/A | 04/30/2012 |
| **VI.**<br>Elf Aquitaine, Inc.<br>TexasGulf Inc.<br>TexasGulf Canada, Ltd.<br>TexasGulf Panama, Inc.<br>TexasGulf Sulphur Company<br>TexasGulf Minerals and Metals Company | 1201 Louisiana Street, Suite 1800<br>Houston, TX 77002 | N/A | 04/30/2012 |
| **VII.**<br>Terra Industries Inc.<br>Inspiration Development Company<br>Inspiration Gold Incorporated<br>Terra Capital Holdings, Inc.<br>CF Industries Enterprises, Inc.<br>CF Industries, Inc.<br>CF Industries Holdings, Inc. | 4 Parkway North, Suite 400<br>Deerfield, IL 60015-2590 | N/A | 04/30/2012 |
| **VIII.**<br>Exxon Mobil Corporation<br>Exxon Coal and Minerals Company<br>Exxon Company<br>Exxon Corporation<br>Exxon Minerals Company<br>Humble Oil & Refining Company<br>Standard Oil Company of New Jersey<br>ExxonMobil Upstream Research Company<br>(f/k/a Exxon Production Research Company)<br>ExxonMobil Research and Engineering<br>Company (f/k/a Exxon Research &<br>Engineering Company)<br>Imperial Oil Resources Limited (f/k/a Esso<br>Resources Canada Limited)<br>Imperial Oil Limited<br>Exxon-Arco-Sohio Joint Committee<br>Superior Oil Company<br>Exxon Corporation, USA<br>ExxonMobil Oil Corporation<br>Mobil<br>Mobil Exploration and Producing North<br>America, Inc.<br>Mobil Oil Corp.<br>Mobil Oil Corporation | 1001 Wampanoag Trail<br>East Providence, RI 02915 | N/A | 04/30/2012 |

**ALL OTHER TERMS, EXCLUSIONS, AND CONDITIONS OF THE POLICY APPLY AND REMAIN UNCHANGED.**

# Choice of Law


**ZURICH**®

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EPC 9244196 00 | 4/30/2012 | 4/30/2022 | 4/30/2012 | 37509000 | --- | --- |

**Named Insured and Mailing Address:**

THE STATE OF COLORADO ACTING BY AND
THROUGH THE BOARD OF TRUSTEES OF
COLORADO SCHOOL OF MINES
1500 ILLINOIS STREET
GOLDEN, CO 80401-1843

**Producer:**

ENVIRONMENTAL RISK AGENCY LLC
1627 W MAIN STREET, SUITE 285
BOZEMAN, MT 59715-4011

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Z Choice Pollution Liability- Claims Made and Reported Coverage**

In consideration of the payment of  premium and the Deductible by the "named insured" and in reliance upon the statements made in the application process and in the Application all of which are made a part hereof, we agree, subject to all the terms, exclusions and conditions of the policy, that CONDITIONS (Section VIII.), Condition G. is deleted in its entirety.

**ALL OTHER TERMS, EXCLUSIONS, AND CONDITIONS OF THE POLICY APPLY AND REMAIN UNCHANGED.**



# Fines & Penalties Endorsement
# (Sub-Limit of Liability)

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EPC 9244196 00 | 4/30/2012 | 4/30/2022 | 4/30/2012 | 37509000 | --- | --- |

**Named Insured and Mailing Address:**

THE STATE OF COLORADO ACTING BY AND
THROUGH THE BOARD OF TRUSTEES OF
COLORADO SCHOOL OF MINES
1500 ILLINOIS STREET
GOLDEN, CO 80401-1843

**Producer:**

ENVIRONMENTAL RISK AGENCY LLC
1627 W MAIN STREET, SUITE 285
BOZEMAN, MT 59715-4011

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Z Choice Pollution Liability - Claims Made and Reported Coverage**

| "Covered Locations" Schedule |
|---|
| 1500 ILLINOIS STREET, GOLDEN, CO 80401 INCLUDING GOLDEN CITY OWNED PART THAT WAS USED/LEASED BY CSMRI DESCRIBED AS THE PARCEL OF LAND LOCATED IN THE NORTHEAST QUARTER OF SECTION 33, TOWNSHIP 3 SOUTH, RANGE 70 WEST OF THE 6TH P.M., CITY OF GOLDEN, COUNTY OF JEFFERSON, STATE OF COLORADO, BEING ALL OF THE LAND DESCRIBED IN THE FOLLOWING DOCUMENTS, RECORDED AT THE OFFICE OF THE JEFFERSON COUNTY CLERK & RECORDER: RECEPTION 2007014356 RECORDED ON FEBRUARY 5, 2007 |

In consideration of the payment of premium and the Deductible by the "named insured" and in reliance upon the statements made in the application process and in the Application all of which are made a part hereof, we agree, subject to all the terms, exclusions, and conditions of the policy, that the following modifications apply to the policy solely with respect to coverage provided by this endorsement and only for the "covered locations" scheduled above.

I.   EXCLUSIONS (Section IV.) paragraph D. Fines, Penalties and Punitive Damages is amended as follows:

   **D.   Fines, Penalties and Punitive Damages**

   Any fines, penalties, or punitive, exemplary or multiple damages.  However, this exclusion does not apply to civil fines or penalties, or to punitive, exemplary or multiple damages to the extent such damages are insurable by law, and provided further that any coverage for such fines or penalties or punitive, exemplary or multiple damages are subject to the following conditions:

   1.   the civil fines or penalties, or punitive, exemplary or multiple damages must result from a "claim" wherein we are obligated to pay "loss" under the terms and conditions of the policy; and

   2.   the amount of money that we are obligated to pay for civil fines or penalties, or punitive, exemplary or multiple damages is limited to the Fines, Penalties and Punitive Damages Sub-Limit set forth in this endorsement.

II.  Item 3., Limits of Liability of the Declarations shall be amended to add the following:

   **Item 3:   Limits of Liability:**   $1,000,000   Each Pollution Event Fines, Penalties and Punitive Damages Sub-Limit

$1,000,000    Aggregate Fines, Penalties and Punitive Damages Sub-Limit

**ALL OTHER TERMS, EXCLUSIONS, AND CONDITIONS OF THE POLICY APPLY AND REMAIN UNCHANGED.**

# Nuclear Exclusion



**ZURICH**®

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EPC 9244196 00 | 4/30/2012 | 4/30/2022 | 4/30/2012 | 37509000 | --- | --- |

**Named Insured and Mailing Address:**

THE STATE OF COLORADO ACTING BY AND
THROUGH THE BOARD OF TRUSTEES OF
COLORADO SCHOOL OF MINES
1500 ILLINOIS STREET
GOLDEN, CO 80401-1843

**Producer:**

ENVIRONMENTAL RISK AGENCY LLC
1627 W MAIN STREET, SUITE 285
BOZEMAN, MT 59715-4011

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**.

This endorsement modifies insurance provided under the following:

**Z Choice Pollution Liability - Claims Made and Reported Coverage**

In consideration of the payment of premium and the Deductible by the "named insured" and in reliance upon the statements made in the application process and in the Application all of which are made a part hereof, we agree, subject to all the terms, exclusions, and conditions of the policy, that the following is added to EXCLUSIONS (Section IV.):

**Nuclear**

1.  Any coverage for "cleanup costs," or "loss", "natural resource damages" or "other loss" and including any applicable "claim expenses:"

    a.  With respect to which an "insured" under the policy is also an "insured" under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an "insured" under any such policy but for its termination upon exhaustion of its limit of liability; or

    b.  Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2.  Under any liability coverage, "cleanup costs," "loss", "natural resource damages" or "other loss" including any applicable "claim expenses" resulting from "hazardous properties" of "nuclear material," if:

    a.  The "nuclear material" (i) is at any "nuclear facility" owned by or operated by or on behalf of, an "insured" or (ii) has been discharged or dispersed therefrom;

    b.  The "nuclear material" is contained in "spent fuel," or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

    c.  The "cleanup costs," "loss," "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

As used in this exclusion:

**"Hazardous properties"** includes radioactive, toxic or explosive properties.

**"Nuclear material"** means "source material," "special nuclear material" or "by-product material."

**"Source material," "special nuclear material,"** and **by-product material"** have the meanings given them in the Atomic Energy act of 1954 or in any law amendatory thereof.

**"Spent fuel"** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor."

**"Waste"** means any waste matter (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility."

**"Nuclear facility"** means:

a.   Any "nuclear reactor";

b.   Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel," or (3) handling, processing or packaging "waste";

c.   Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

d.   Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

**"Nuclear reactor"** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.  "Property damage" for the purposes of this endorsement, includes all forms of radioactive contamination of property.

**ALL OTHER TERMS, EXCLUSIONS, AND CONDITIONS OF THE POLICY APPLY AND REMAIN UNCHANGED.**



# Schedule of Covered Locations with Material Change in Use/Operations Exclusion

## ZURICH®

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EPC 9244196 00 | 4/30/2012 | 4/30/2022 | 4/30/2012 | 37509000 | --- | --- |

**Named Insured and Mailing Address:**

THE STATE OF COLORADO ACTING BY AND
THROUGH THE BOARD OF TRUSTEES OF
COLORADO SCHOOL OF MINES
1500 ILLINOIS STREET
GOLDEN, CO 80401-1843

**Producer:**

ENVIRONMENTAL RISK AGENCY LLC
1627 W MAIN STREET, SUITE 285
BOZEMAN, MT 59715-4011

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Z Choice Pollution Liability - Claims Made and Reported Coverage**

In consideration of the payment of premium and the Deductible by the "named insured" and in reliance upon the statements made in the application process and in the Application all of which are made a part hereof, we agree, subject to all the terms, exclusions, and conditions of the policy, that the following are "covered location(s)" for purposes of Section III. Definitions, paragraph E.:

| Covered Location Description | Use Description | Retroactive Date | Delimitation Date |
|---|---|---|---|
| 1500 ILLINOIS STREET, GOLDEN, CO 80401 INCLUDING GOLDEN CITY OWNED PART THAT WAS USED/LEASED BY CSMRI DESCRIBED AS THE PARCEL OF LAND LOCATED IN THE NORTHEAST QUARTER OF SECTION 33, TOWNSHIP 3 SOUTH, RANGE 70 WEST OF THE 6TH P.M., CITY OF GOLDEN, COUNTY OF JEFFERSON, STATE OF COLORADO, BEING ALL OF THE LAND DESCRIBED IN THE FOLLOWING DOCUMENTS, RECORDED AT THE OFFICE OF THE JEFFERSON COUNTY CLERK & RECORDER: RECEPTION 2007014356 RECORDED ON FEBRUARY 5, 2007 | UNIVERSITY CAMPUS WITH GROUNDWATER USE RESTRICTION EXCEPT FOR MONITORING | N/A | 04/30/2012 |

It is further agreed that the following is added to Section IV (Exclusions):

**Material Change in Use or Operations**

Any material change in the use of, or operations conducted at, a "covered location" from that which was disclosed in the Application or listed on this Schedule of Covered Locations endorsement.  However, this exclusion does not apply to a specific change in use of, or operations conducted at, a "covered location" to which we have expressly given our prior written consent.

**ALL OTHER TERMS, EXCLUSIONS, AND CONDITIONS OF THE POLICY APPLY AND REMAIN UNCHANGED.**

## Minimum Earned Premium Endorsement



**ZURICH**®

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EPC 9244196 00 | 4/30/2012 | 4/30/2022 | 4/30/2012 | 37509000 | --- | --- |

**Named Insured and Mailing Address:**

THE STATE OF COLORADO ACTING BY AND
THROUGH THE BOARD OF TRUSTEES OF
COLORADO SCHOOL OF MINES
1500 ILLINOIS STREET
GOLDEN, CO 80401-1843

**Producer:**

ENVIRONMENTAL RISK AGENCY LLC
1627 W MAIN STREET, SUITE 285
BOZEMAN, MT 59715-4011

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**.

This endorsement modifies insurance provided under the following:

**Z Choice Pollution Liability - Claims Made and Reported Coverage**

In consideration of the payment of  premium and the Deductible by the "named insured" and in reliance upon the statements made in the application process and in the Application all of which are made a part hereof, we agree, subject to all the terms, exclusions and conditions of the policy, that for purposes of CONDITIONS, Section VIII., paragraph E. Cancellation, the premium set forth in Item 8 of the Declarations is fully earned as of the inception date.

**ALL OTHER TERMS, EXCLUSIONS, AND CONDITIONS OF THE POLICY APPLY AND REMAIN UNCHANGED.**



# Maintenance, Upgrades, Improvements or Installations Endorsement

**ZURICH**®

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EPC 9244196 00 | 4/30/2012 | 4/30/2022 | 4/30/2012 | 37509000 | --- | --- |

**Named Insured and Mailing Address:**

THE STATE OF COLORADO ACTING BY AND
THROUGH THE BOARD OF TRUSTEES OF
COLORADO SCHOOL OF MINES
1500 ILLINOIS STREET
GOLDEN, CO 80401-1843

**Producer:**

ENVIRONMENTAL RISK AGENCY LLC
1627 W MAIN STREET, SUITE 285
BOZEMAN, MT 59715-4011

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Z Choice Pollution Liability - Claims Made and Reported Coverage**

In consideration of the payment of premium and the self-insured retention by the "named insured" and in reliance upon the statements made in the application process and in the Application all of which are made a part hereof, we agree, subject to all the terms, exclusions and conditions of the policy, that EXCLUSIONS (Section IV), paragraph G. Maintenance, Upgrades, Improvements or Installations is deleted in its entirety and replaced with the following:

**G.  Maintenance, Upgrades, Improvements or Installations**

Any costs, charges or expenses for maintenance, upgrade or improvement of, or installation of any preventative measures to, any property or processes on, at, within or under a "covered location" even if such maintenance, upgrade, improvement or installation is required:

1.  By "governmental authority"; or

2.  As a result of "cleanup costs", "loss", "natural resource damages" or "other loss" otherwise covered under the policy.

**ALL OTHER TERMS, EXCLUSIONS, AND CONDITIONS OF THE POLICY SHALL AND REMAIN UNCHANGED.**

# Z Choice Coverage F:  Non-Owned Locations (Blanket)



**ZURICH**®

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EPC 9244196 00 | 4/30/2012 | 4/30/2022 | 4/30/2012 | 37509000 | --- | --- |

**Named Insured and Mailing Address:**

THE STATE OF COLORADO ACTING BY AND
THROUGH THE BOARD OF TRUSTEES OF
COLORADO SCHOOL OF MINES
1500 ILLINOIS STREET
GOLDEN, CO 80401-1843

**Producer:**

ENVIRONMENTAL RISK AGENCY LLC
1627 W MAIN STREET, SUITE 285
BOZEMAN, MT 59715-4011

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Z Choice® Pollution Liability- Claims Made and Reported Coverage**

In consideration of the payment of premium and the Deductible by the "named insured" and in reliance upon the statements made in the application process and in the Application all of which are made a part hereof, we agree, subject to all the terms, exclusions and conditions of the policy, that the following changes are made to the policy solely with respect to coverage under this endorsement and solely with respect to waste and/or materials generated at the following "covered locations" and subject to any applicable "retroactive date":

| Covered Location | Retroactive Date |
|---|---|
| 1500 ILLINOIS STREET  GOLDEN, CO 80401 INCLUDING GOLDEN CITY OWNED PART THAT WAS USED/LEASED BY CSMRI DESCRIBED AS THE PARCEL OF LAND LOCATED IN THE NORTHEAST QUARTER OF SECTION 33, TOWNSHIP 3 SOUTH, RANGE 70 WEST OF THE 6TH P.M., CITY OF GOLDEN, COUNTY OF JEFFERSON, STATE OF COLORADO, BEING ALL OF THE LAND DESCRIBED IN THE FOLLOWING DOCUMENTS, RECORDED AT THE OFFICE OF THE JEFFERSON COUNTY CLERK & RECORDER: RECEPTION 2007014356 RECORDED ON FEBRUARY 5, 2007 | N/A |

I.   INSURING AGREEMENTS (Section I.), is amended to include the following BUT ONLY IF AND TO THE EXTENT COVERAGE F IS SPECIFICALLY LISTED AS PROVIDED IN ITEM 5 OF THE DECLARATIONS

   **COVERAGE F:  NON-OWNED LOCATIONS**

   1.   <u>On-Site</u>

      (a) Bodily Injury

         We will pay "loss" that an "insured" is legally obligated to pay as a result of a "claim" for "bodily injury":

         (i)   sustained by a "third party" while within the boundaries of a "non-owned location"; and

         (ii)   resulting from a "pollution event" on, at or under such "non-owned location";

         provided the "claim" is first made against the "insured" during the "policy period" and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

(b) Property Damage

We will pay "loss" that an "insured" is legally obligated to pay as a result of a "claim" for "property damage":

(i)   to "third party" property within the boundaries of a "non-owned location"; and

(ii)  resulting from a "pollution event" on, at or under such "non-owned location";

provided the "claim" is first made against the "insured" during the "policy period", and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

(c) Third Party Cleanup Costs

We will pay "cleanup costs" that an "insured" is legally obligated to pay as a result of a "claim" resulting from a "pollution event" on, at, or under a "non-owned location", provided the "claim" is first made against the "insured" during the "policy period" and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

Unless covered under any other insuring agreement specifically listed as provided in Item 5 of the Declarations, we shall have no obligation to pay any "loss" or "cleanup costs" attributable to any irritant, contaminant or pollutant that is outside the boundaries of a "non-owned location".

2.  Off-Site

(a) Bodily Injury

We will pay "loss" that an "insured" is legally obligated to pay as a result of a "claim" for "bodily injury":

(i)   sustained by a "third party" while beyond the boundaries of a "non-owned location"; and

(ii)  resulting from a "pollution event" that migrates beyond the boundaries from such "non-owned location";

provided the "claim" is first made against the "insured" during the "policy period", and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

(b) Property Damage

We will pay "loss" that an "insured" is legally obligated to pay as a result of a "claim" for "property damage":

(i)   to "third party" property beyond the boundaries of a "non-owned location"; and

(ii)  resulting from a "pollution event" that is migrating beyond the boundaries from such "non-owned location";

provided the "claim" is first made against the "insured" during the "policy period", and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

(c) Third Party Cleanup Costs

We will pay "cleanup costs" that an "insured" is legally obligated to pay as a result of a "claim" resulting from a "pollution event" that migrates beyond the boundaries from a "non-owned location" provided the "claim" is first made against the "insured" during the "policy period", and the "claim" is reported to us in writing during the "policy period" or any applicable extended reporting period.

Unless covered under any other insuring agreement specifically listed as provided in Item 5 of the Declarations, we shall have no obligation to pay any "loss" or "cleanup costs" attributable to any irritant, contaminant or pollutant that is on, at or under a "non-owned location".

II.   The following are added to DEFINITIONS (Section III.) solely with respect to coverage provided by this endorsement:

**"Non-owned location"** means a location that is neither partially nor wholly owned or operated by an "insured" or any subsidiary or affiliate company of an "insured" that, at the time of any treatment, recycling, reclamation, storage or disposal of any waste, products and/or materials generated from a "covered location" scheduled in this endorsement, is:

1.  Licensed and/or certified by "governmental authority" to accept waste, products and/or materials generated from a "covered location" scheduled in this endorsement; and

2.  Not listed on the CERCLA Information System (CERCLIS) as defined in the Code of Federal Regulations, 40 CFR Part 300.5 (revised as of July 1, 2000) or any state or local equivalent.

**"Third party"** means any person or entity other than an owner, operator, contractor or sub-contractor of the "non-owned location" or their employees.

**III.** The following is added to Section IV. EXCLUSIONS solely with respect to coverage provided by this endorsement:

### Products Liability

Goods or products designed, manufactured, sold, handled, distributed, or supplied by the "insured" or by others trading under their name or under license from the "insured".

**IV.** CONDITIONS (Section VIII.), Condition K., Other Insurance, is replaced with the following solely with respect to coverage provided by this endorsement:

**K. OTHER INSURANCE –** When other insurance is available to the "insured" for "loss" or "cleanup costs" under the terms and conditions of this policy and this endorsement, our obligation to the "insured" shall be as follows:

1. The coverage provided by this policy and this endorsement shall apply as excess insurance over any other valid and collectible insurance, be it primary or excess. Notwithstanding the foregoing, this excess insurance shall operate as primary insurance as a result of the receivership, insolvency, or inability to pay of any insurer with respect to both the duty to indemnify and the duty to defend but shall not apply as primary insurance to the "insured" while acting as a self-insured for any coverage.

2. Where this insurance is excess insurance, we will pay only our share of the amount of "loss" or "cleanup costs" if any, that exceeds the total amount of all such valid and collectible insurance.

The "insured" shall promptly, upon our request, provide us with copies of all policies potentially applicable to liability covered by this endorsement.

**ALL OTHER TERMS, EXCLUSIONS, AND CONDITIONS OF THE POLICY APPLY AND REMAIN UNCHANGED.**

# Deed Restrictions and Land Use Controls Exclusion



**ZURICH**®

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EPC 9244196 00 | 4/30/2012 | 4/30/2022 | 4/30/2012 | 37509000 | --- | --- |

**Named Insured and Mailing Address:**

THE STATE OF COLORADO ACTING BY AND
THROUGH THE BOARD OF TRUSTEES OF
COLORADO SCHOOL OF MINES
1500 ILLINOIS STREET
GOLDEN, CO 80401-1843

**Producer:**

ENVIRONMENTAL RISK AGENCY LLC
1627 W MAIN STREET, SUITE 285
BOZEMAN, MT 59715-4011

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Z Choice® Pollution Liability- Claims Made and Reported Coverage**

In consideration of the payment of premium and the Deductible by the "named insured" and in reliance upon the statements made in the application process and in the Application all of which are made a part hereof, we agree, subject to all the terms, exclusions and conditions of the policy, that EXCLUSIONS (Section IV.) shall be amended to add the following:

**Deed Restrictions and Land Use Controls**

Any noncompliance with, or violation of, any deed restrictions, restrictive covenants or land use controls applicable to a "covered location".

**ALL OTHER TERMS, EXCLUSIONS, AND CONDITIONS OF THE POLICY APPLY AND REMAIN UNCHANGED.**

**Known Pollution Event Schedule**
**Third Party Bodily Injury, Property Damage,**
**Governmentally Mandated Cleanup Costs  and**
**Natural Resource Damages**
**With Excluded Pollution Events**



**ZURICH**

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EPC 9244196-00 | 04/30/2012 | 04/30/2022 | 04/30/2012 | 37509000 | -- | -- |

**Named Insured and Mailing Address:**

THE STATE OF COLORADO ACTING BY AND
THROUGH THE BOARD OF TRUSTEES OF
COLORADO SCHOOL OF MINES
1500 ILLINOIS STREET
GOLDEN, CO 80401-1843

**Producer:**

ENVIRONMENTAL RISK AGENCY LLC
1627 W MAIN STREET, SUITE 285
BOZEMAN, MT 59715-4011

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Z Choice Pollution Liability - Claims Made and Reported Coverage**

In consideration of the payment of premium and the Deductible by the "named insured" and in reliance upon the statements made in the application process and in the Application all of which are made a part hereof, we agree, subject to all the terms, exclusions, and conditions of the policy, that:

1.  A. Pursuant to EXCLUSIONS (Section IV.), Exclusion E., all of the coverage specifically listed as provided in Item 3 of the Declarations shall apply to the known "pollution event(s)" scheduled below and the coverage provided by this endorsement, except for First Party Discovery in Coverage A and/or C or any First Party Discovery coverage provided in an endorsement attached to this policy.

| "COVERED LOCATION" | "POLLUTION EVENT" REFERENCE |
|---|---|
| 1500 Illinois St., Golden, CO 80401 including Golden city owned part that was used/lease by CSMRI described as the parcel of land located in the Northeast Quarter of Section 33, Township 3 South, Range 70 West, of the 6th P.M., City of Golden, County of Jefferson, State of Colorado, being all of the land described in the following documents, recorded at the office of the Jefferson County Clerk & Recorder: Reception 2007014356 recorded on February 5, 2007. | "Pollution event(s)" in soil and groundwater as fully described in the following reports:<br><br>1. CSMRI Site Environmental Conditions: History, Investigation, and Cleanup Implementation Report as of 2011, Linn D. Havelick, Colorado School of Mines, November 2011.<br><br>2. Subject: Golden Tailing Pond, memorandum, Coulson to Krause, June 11, 1976.<br><br>3. Colo. School of Mines Research Institute Waste Disposal Pit, Louis E. Bolis, undated, and Location of Waste Dump, CSM Research Institute, drawing by Louis E. Bolis, January 3, 1977.<br><br>4. CSMRI Facilities Condition Report, Colorado School of Mines Facilities Department, August 1, 1985.<br><br>5. Colorado School of Mines Research Institute, Tailings Pond Sampling Report, Industrial Compliance, Inc., 1989.<br><br>6. Task 1: Site Characterization and Pathways Analysis, Claypits Site |

Copyright © 2008 by Zurich American Insurance Company

All rights reserved.  No part of this document covered by the copyrights hereon may be reproduced or copied in any form by any means – graphic, electronic, or mechanical, including photocopying, taping or information storage and retrieval systems – without written permission of the Zurich American Insurance Company.

STF-EPC-MAN-1  CW (04/12)
Page 1 of 4

and CSMRI Facility, Golden, Colorado, James L. Grant & Associates, April 30, 1990.

7. Summary Report on Site Investigation and Removal Activities, CSMRI Creekside Site, Golden, Jefferson County, Colorado, Ecology and Environment, Inc., March 17, 1993.

8. Colorado School of Mines Research Institute Radiological Survey Plan, September 12, 1994, Wastren Remediation.

9. Removal Action Options Analysis, Colorado School of Mines Research Institute, Golden, Colorado, June 12, 1995;

10. Draft Materials Characterization, Colorado School of Mines Research Institute Experimental Plant, January 18, 1996, AWS Remediation, Inc.

11. Track 1 Comprehensive Work Plan, Dismantling, Demolition and Removal of Building 101 at the CSMRI Site, Golden, Colorado, AWS Remediation, Inc., March 1996.

12. Letter Report Surface Gamma Radiation Survey Former Soil Stockpile Location Colorado School of Mines, Golden, Colorado, Earth Sciences Consultants, Inc., July 20, 1996.

13. Subject: Coordination of Future Regulatory Efforts at the Colorado School of Mines Research Institute Site, Golden, Colorado, Quillin and Roitman, CDPHE to Dodson & Rushin, U.S. EPA, November 8, 1996.

14. Re: Colorado Radioactive Materials License #617-01, Simpson & Mallory to Arnott & Krumberger, April 25, 1997.

15. Final Report – Drummed Research Materials Disposal, Environmental Resources Management (ERM), July 25, 1997.

16. Summary Report Regarding Removal of Niobium Ore, Gravel Application, and Surface Gamma Radiation Survey Activities at the Former Colorado School of Mines Research Institute, August 25, 1997.

17. Colorado Radioactive Materials License #617-01, Colorado School of Mines Research Institute (CSMRI), Golden, Colorado, Simpson to Iatridis, February 18, 1998.

18. Colorado School of Mines Research Institute Site, Clay Pits Soil Boring Locations, URS Greiner Woodward-Clyde, April 1999.

19. Characterization Survey Work Plan, Colorado School of Mines Research Institute Site, Golden, Colorado, July 23, 2001, URS Corporation.

20. Colorado School of Mines Research Institute, Concrete and Asphalt Characterization, Golden, Colorado, Final Report, July 15, 2002, URS Corporation.

21. Concrete/Asphalt Removal and Disposal, Colorado School of Mines Research Institute Site Environmental Assessment and Response (Phase 1), Draft, April 11, 2003, New Horizons Environmental Consultants, Inc.

22. Remedial Investigation/Feasibility Study and Proposed Plan, Colorado School of Mines Research Institute Site, Golden, CO, New Horizons Environmental Consultants, Inc., January 21, 2004

23. Subject: CSMRI soil cutoff values for planning and budgeting purposes, Schieffelin to Havelick, February 26, 2004.

24. Dose Assessment for the Emplacement of the CSMRI Site Containerized and Remaining Subsurface Soil into a RCRA Subtitle D Solid Waste Landfill, S.M. Stoller Corporation, April 1, 2005.

25. Subject: Colorado School of Mines Research Institute (CSMRI) Creekside Facility Site Remediation, Vranka to Havelick, August 25, 2005.

Copyright © 2012 by Zurich American Insurance Company

All rights reserved.  No part of this document covered by the copyrights hereon may be reproduced or copied in any form by any means – graphic, electronic, or mechanical, including photocopying, taping or information storage and retrieval systems – without written permission of the Zurich American Insurance Company.

26. CSMRI Creekside Site Final Site Characterization Work Plan, May 12, 2006, S.M. Stoller Corporation.

27. Clay Pits Investigation Colorado School of Mines Research Institute Site, Brinkman to Stoffey, November 10, 2006.

28. Groundwater Monitoring Well Installation Work Plan CSMRI Site, S.M. Stoller Corporation, December 6, 2006.

29. RE: CSMRI Site Characterization – Creekside facility, Radioactive Materials License Number 617-01, Tarlton to Havelick, December 13, 2006.

30. Clay Pits Area Remedial Site Investigation Report, April 2007, S.M. Stoller Corporation.

31. Colorado School of Mines Research Institute Site, Revised Remedial Investigation/Feasibility Study and Proposed Plan, May 2007, S.M. Stoller Corporation.

32. Monitoring Report for CSMRI Site Second Quarter 2007, S.M. Stoller Corporation, August 2007.

33. RE: Clay Pits Area Remedial Site Investigation Report, Colorado School of Mines Research Institute – Creekside Facility, Radioactive Materials License Number 617-01, Tarlton to Havelick, September 14, 2007.

34. Monitoring Report for CSMRI Site Fourth Quarter 2007, S.M. Stoller Corporation, February 2008.

35. Monitoring Report for CSMRI Site Third Quarter 2008, S.M. Stoller Corporation, November 2008.

36. CSMRI Site Remedial Action Implementation Report, S.M. Stoller, September 2009.

37. RE: Colorado School of Mines Research Institute -Creekside Facility Radioactive Materials License Number 617-01 Creekside Remedial Implementation Action Report, Tarlton to Havelick, October 14, 2009.

38. Monitoring Report for CSMRI Site Third Quarter 2009, S.M. Stoller Corporation, November 2009.

39. Draft Work Plan Environmental Assessment and Characterization Colorado School of Mines Research Institute Site Flood Plain Area Golden, Colorado, January 8, 2010, S.M. Stoller Corporation.

40. Final Revised Draft Work Plan Environmental Assessment and Characterization Colorado School of Mines Research Institute Site Flood Plain Area Golden, Colorado, August 2010, S.M. Stoller Corporation.

41. RE: Colorado School of Mines Research Institute - Creekside Facility, Radioactive Materials License Number 617-01, CSMRI Environmental Assessment and Characterization, Opila to Havelick, August 20, 2010.

42. Monitoring Report for CSMRI Site Second Quarter 2011, S.M. Stoller Corporation, August 2011.

43. Draft Final Remedial Investigation/Feasibility Study and Proposed Plan Colorado School of Mines Research Institute Site Flood Plain Area, Golden, Colorado, S.M. Stoller Corporation, November 2011

44. Letter to Atlas Metals and Iron Corporation regarding removal of two 10,000 gallon underground storage tanks (USTs) from the Weaver Towers; by Colorado School of Mines Environmental Health and Safety; dated August 3, 2009

45. No Action Determination for Stevinson Ford; 1301 19th St. Golden, CO 80401 by Colorado Department of Public Health and Environment and dated November 2, 2009.

46. Letter from Colorado Department of Public Health and

Copyright © 2012 by Zurich American Insurance Company

All rights reserved.  No part of this document covered by the copyrights hereon may be reproduced or copied in any form by any means – graphic, electronic, or mechanical, including photocopying, taping or information storage and retrieval systems – without written permission of the Zurich American Insurance Company.

| | |
|---|---|
| | Environment regarding "Colorado School of Mines Research Institute – Creekside Facility, Radioactive Materials License Number 617-01, Arsenic Cleanup"; dated March 12, 2012 |

B.   With respect to the known "pollution event(s)" scheduled above and the coverage provided by this endorsement, DEFINITIONS (Section III.), shall be amended as follows:

Paragraph B. "claim" is deleted and replaced as follows:

**"Claim"** means a written demand or written notice received by the "insured" alleging liability or responsibility on the part of the "insured". "Claim" does not include:

1. a "potential claim" that was reported in a prior policy period as described in CLAIM PROVISIONS (Section VII., B. NOTICE OF POTENTIAL CLAIM), that has become a "claim" during the "policy period"; or

2. a written demand or written notice received by the "insured" for "cleanup costs" unless such written demand or written notice received by the "insured" is made by and pursuant to "governmental mandate".

The following Definition shall be added to the policy:

"Governmental mandate" means a written directive or written order of the government of the United States or any of its States, and political subdivisions including Colorado Department of Public Health and Environment (CDPHE) or court order duly acting under the authority of environmental or related laws alleging liability or responsibility on the part of the "insured" to incur "cleanup costs" as a result of the known "pollution event" scheduled to the policy.

2.   Pursuant to the coverage provided per the amendment to EXCLUSIONS (Section IV.), Exclusion E., as performed in paragraph 1. above on this endorsement, the "pollution event(s)" scheduled below in paragraph 2 are and remain excluded solely with respect to that portion of the "covered location" indicated below but only with respect to "claims" for "cleanup costs" and/or "natural resource damages".

| **"COVERED LOCATION"** | **"POLLUTION EVENT"** |
|---|---|
| Area along Clear Creek between the Creek and School's sports fields near the intersection of Maple and 11th Street also known as CSMRI "Flood Plain Site". More generally on the south side of Clear Creek, east of U.S. Highway 6, in the northeast quarter of the northwest quarter of Section 33, Township 3 South, Range 70 and specifically depicted as "Flood Plain Characterization Area" on Figure 1-2 attached to the August 2010, Final Work Plan from S.M. Stoller Corporation, on file with the company. | "Pollution Event(s)" in groundwater associated with uranium as fully described in the reports indicated in Paragraph 1. Above. |

3.   Pursuant to the coverage provided per the amendment to EXCLUSIONS (Section IV.), Exclusion E., as performed in paragraph 1. above on this endorsement, the "pollution event(s)" scheduled below in paragraph 3 are and remain excluded with respect to the "covered location" indicated below and with respect to "claims" for "cleanup costs", "bodily injury", "property damage" and/or "natural resource damages".

Copyright © 2012 by Zurich American Insurance Company

All rights reserved.  No part of this document covered by the copyrights hereon may be reproduced or copied in any form by any means – graphic, electronic, or mechanical, including photocopying, taping or information storage and retrieval systems – without written permission of the Zurich American Insurance Company.

| "COVERED LOCATION" | "POLLUTION EVENT" |
|---|---|
| 1500 Illinois St., Golden, CO 80401 including Golden city owned part that was used/lease by CSMRI described as the parcel of land located in the Northeast Quarter of Section 33, Township 3 South, Range 70 West, of the 6th P.M., City of Golden, County of Jefferson, State of Colorado, being all of the land described in the following documents, recorded at the office of the Jefferson County Clerk & Recorder: Reception 2007014356 recorded on February 5, 2007. | "Pollution Event(s)" in soil and groundwater associated with former underground storage tanks (USTs) as fully described in the following reports:<br><br>• Underground Storage Tank Schedule. Prepared by Linn Havelick. Date: April 24, 2012 but only for tanks #3 through #10 inclusive.<br><br>• Location: CSMRI Building 6; "Initial Underground Storage Tank Closure Assessment" prepared by Industrial Compliance, Inc. IC Project No. 1-2580. Date: June 8, 1990.<br><br>• Location: Heat Plant/Coolbaugh; "Notification of Underground Storage Tanks" EPA Form 7530-1 (11-85) dated 06/16/1985.<br><br>• Location: Jefferson County Treasurer and Assessor Building; "Site Characterization/Corrective Action Plan" by Western Environment and Ecology, Inc. Project #27-003-01 dated December 1, 1994.<br><br>• Location: Prospector Village; UST Registration Invoice dated 3/6/1991; Letter of Destruction by Du-Wald Steel Corporation dated April 8, 1996; "Underground Heating Oil Tank Removal Specifications" by CSM Environmental Health and Safety Department dated September 1995.<br><br>• Location: Student Center; UST Registration; "Notification of Underground Storage Tanks" EPA Form 7530-1 (11-85) dated 06/16/1986<br><br>• Location: Truck Shop; UST Registration Invoice dated 3/6/1990; Letter of Destruction by Iron and Metals, Inc dated October 28, 1993; "Notification of Underground Storage Tanks" EPA Form 7530-1 (11-85) dated 06/20/1986 |

4.   The "pollution event(s)" referenced above include any contaminants generally accepted in the relevant scientific community at the time of the effective date of the applicable insuring agreement specifically listed as provided in Item 5 of the Declarations or as a byproduct or breakdown product of any of the contamination referred to above, whether listed on this endorsement or not. The "pollution event" shall be deemed to include the entire quantity and geographic extent of any contaminant which is ultimately determined to have been released as or to have constituted part of such "pollution event," without regard to whether:

   a. The contaminant, or its byproduct or breakdown product, was identified in a quantity or concentration requiring remedial action or such quantity or concentration represents the natural background concentration of the contaminant, byproduct or breakdown product; or

   b. The contaminant, or its byproduct or breakdown product, is subsequently determined to have migrated across or through one or more environmental media before or after identification as part of the "pollution event".


4.   Following our receipt and satisfactory review of a "no further action" or other equivalent confirmation from the regulatory entity having jurisdiction over the "pollution event" that no further cleanup or other action is required with respect to such "pollution event(s)" that are and remain excluded, we will amend this endorsement modifying the exclusion provided that any such modification may include specific terms, conditions, sub-limits of liability, or separate deductibles/retentions we reasonably deem necessary and appropriate.

Copyright © 2012 by Zurich American Insurance Company

All rights reserved.  No part of this document covered by the copyrights hereon may be reproduced or copied in any form by any means – graphic, electronic, or mechanical, including photocopying, taping or information storage and retrieval systems – without written permission of the Zurich American Insurance Company.

5.  It is hereby acknowledged that the "pollution event(s)" disclosed in the disclosed documents referenced in this endorsement comprised of radioactive materials and other metals at the "covered location" from the activities at the "covered location" described in the disclosed documents are not excluded by the Nuclear Exclusion attached to this policy.

All other terms, exemptions, and conditions of the policy apply and remain unchanged.

Signed by:_____     _____
        Authorized Representative                Date

Copyright © 2012 by Zurich American Insurance Company

STF-EPC-MAN-1 CW (4/12)
Page 6 of 6

All rights reserved.  No part of this document covered by the copyrights hereon may be reproduced or copied in any form by any means – graphic, electronic, or mechanical, including photocopying, taping or information storage and retrieval systems – without written permission of the Zurich American Insurance Company.



# Pollution Event Definition – Including Radioactive Waste and Materials

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EPC 9244196 00 | 4/30/2012 | 4/30/2022 | 4/30/2012 | 37509000 | --- | --- |

**Named Insured and Mailing Address:**

THE STATE OF COLORADO ACTING BY AND
THROUGH THE BOARD OF TRUSTEES OF
COLORADO SCHOOL OF MINES
1500 ILLINOIS STREET
GOLDEN, CO 80401-1843

**Producer:**

ENVIRONMENTAL RISK AGENCY LLC
1627 W MAIN STREET, SUITE 285
BOZEMAN, MT 59715-4011

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Z Choice Pollution Liability - Claims Made and Reported Coverage**

In consideration of the payment of premium and the Deductible by the "named insured" and in reliance upon the statements made in the application process and in the Application all of which are made a part hereof, we agree, subject to all the terms, exclusions, and conditions of the policy, that DEFINITIONS (Section III.),  Paragraph V. "Pollution Event" is deleted and replaced as follows:

**V.  "Pollution event"** means the discharge, dispersal, release, or escape of any solid, liquid, gaseous or thermal irritant, contaminant or pollutant, including smoke, vapor, soot, fumes, acids, alkalis, toxic or hazardous substances, electromagnetic fields, chemicals, waste (including medical, infectious and pathological waste), and  radioactive waste and materials,  into or upon land, or any structure on land, the atmosphere, or any watercourse or body of water including groundwater, in concentrations or at levels in excess of those naturally present in the environment.

**ALL OTHER TERMS, EXCLUSIONS, AND CONDITIONS OF THE POLICY APPLY AND REMAIN UNCHANGED.**

# Broad Named Insured



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EPC 9244196 00 | 4/30/2012 | 4/30/2022 | 4/30/2012 | 37509000 | --- | --- |

**Named Insured and Mailing Address:**

THE STATE OF COLORADO ACTING BY AND
THROUGH THE BOARD OF TRUSTEES OF
COLORADO SCHOOL OF MINES
1500 ILLINOIS STREET
GOLDEN, CO 80401-1843

**Producer:**

ENVIRONMENTAL RISK AGENCY LLC
1627 W MAIN STREET, SUITE 285
BOZEMAN, MT 59715-4011

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Z Choice Pollution Liability - Claims Made and Reported Coverage**

In consideration of the payment of  premium and the Deductible by the "named insured" and in reliance upon the statements made in the application process and in the Application all of which are made a part hereof, we agree, subject to all the terms, exclusions and conditions of the policy, that DEFINITIONS, Section III., paragraph P. "named insured" is deleted and replaced with the following:

P.   **"Named insured"** means:

1.  The person or entity set forth in Item 1 of the Declarations; and

2.  Those Colorado public entities having direct day to day management control over the normal and customary operations of such Named Insured but only to the extent of the "covered location".

**ALL OTHER TERMS, EXCLUSIONS, AND CONDITIONS OF THE POLICY APPLY AND REMAIN UNCHANGED.**

# Correction Endorsement


**ZURICH**®

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EPC 9244196 00 | 4/30/2012 | 4/30/2022 | 4/30/2012 | 37509000 | --- | --- |

**Named Insured and Mailing Address:**

THE STATE OF COLORADO ACTING BY AND
THROUGH THE BOARD OF TRUSTEES OF
COLORADO SCHOOL OF MINES
1500 ILLINOIS STREET
GOLDEN, CO 80401-1843

**Producer:**

ENVIRONMENTAL RISK AGENCY LLC
1627 W MAIN STREET, SUITE 285
BOZEMAN, MT 59715-4011

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Z Choice Pollution Liability - Claims Made and Reported Coverage**

In consideration of the payment of premium and the Deductible by the "named insured" and in reliance upon the statements made in the Application all of which are made a part hereof, we agree, subject to all the terms, exclusions, and conditions of the policy, that the following correction is made to the policy:

With respect to the In consideration clause found in the policy and each endorsement, the reference to the phrase statements made in the Application process shall be deleted and the In consideration clause shall be read to include statements made in the Application.

**ALL OTHER TERMS, EXCLUSIONS, AND CONDITIONS OF THE POLICY APPLY AND REMAIN UNCHANGED.**

# Construction Related Activities and Subsurface Activities Exclusion – Cleanup Costs and Natural Resource Damages



**ZURICH**®

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EPC 9244196 00 | 4/30/2012 | 4/30/2022 | 4/30/2012 | 37509000 | --- | --- |

**Named Insured and Mailing Address:**

THE STATE OF COLORADO ACTING BY AND
THROUGH THE BOARD OF TRUSTEES OF
COLORADO SCHOOL OF MINES
1500 ILLINOIS STREET
GOLDEN, CO 80401-1843

**Producer:**

ENVIRONMENTAL RISK AGENCY LLC
1627 W MAIN STREET, SUITE 285
BOZEMAN, MT 59715-4011

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Z Choice Pollution Liability - Claims Made and Reported Coverage**

| Schedule |
|---|
| Clay Pits Area (Area #1 - #4) as shown on Figure 2 attached to the Clay Pits Area Remedial Site Investigation Report Colorado School of Mines Research Institute Site Golden, CO; prepared for Colorado School of Mines Golden, CO by The S.M. Stoller Corporation 105 Technology Drive, Suite 190 Broomfield, CO 80021 April 2007. |

In consideration of the payment of premium and the Deductible by the "named insured" and in reliance upon the statements made in the application process and in the Application all of which are made a part hereof, we agree, subject to all the terms, exclusions, and conditions of the policy, and ONLY with respect to the "covered locations" shown in the Schedule above, that:

I.   EXCLUSIONS (Section IV.) is amended to add the following:

**Construction Related and Subsurface Activities**

Any "pollution event", whether unknown to any "insured" or known and provided coverage by a Disclosed Documents or Known Pollution Events Schedule endorsement if applicable, that:

1.   is discovered  as a result of the performance of construction or "construction related activities" or "subsurface activities" undertaken on, at or under a "covered location" shown in the Schedule above;

2.   is subject to "governmental authority" or any other legal obligation during the performance of construction or "construction related activities" or "subsurface activities" undertaken on, at or under a "covered location" shown in the Schedule above; or

3.   would not have resulted in whole or in part but for the performance of construction or "construction related activities" or "subsurface activities" undertaken on, at or under a "covered location" shown in the Schedule above; or

4.  is discovered as a result of any "subsurface activities" required by "governmental authority" including any regulatory agency or other legal obligation in response to any planned construction or "construction related activities".

However, this exclusion shall only apply to "cleanup costs" and/or "natural resource damages."

II.  For purposes of this endorsement the following are added to DEFINITIONS (Section III):

"Construction related activities" means the performing of any activity directly or indirectly related to designing, engineering, planning, construction, demolition, excavation, de-watering, or any other activity undertaken to develop or improve a "covered location" shown in the Schedule above.

"Subsurface activities" means the performing of any exploratory excavations, soil borings, monitoring wells or test pits including the collection of soil, vapor or groundwater samples at the "covered location" shown in the Schedule above.

**ALL OTHER TERMS, EXCLUSIONS, AND CONDITIONS OF THE POLICY APPLY AND REMAIN UNCHANGED.**

# Important Notice
**Service of Suit and In Witness Clause**



ZURICH®

### Service of Suit

In the event an action or proceeding arises under the contract, it is agreed that the Company, at your request, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver or limitation of the right to arbitration as set forth herein or to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or any state in the United States. It is further agreed that service of process in such suit may be made upon Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, IL 62703. In any suit instituted against the Company upon this policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefore, the Company hereby designates the Superintendent, Commissioner or Director of Insurance, other officer specified for that purpose in the statute, or his successors in office as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured of any beneficiary hereunder arising out of this policy of insurance and hereby designates the above named Illinois Corporation Service Company as the entity to whom the said officer is authorized to mail such process or a true copy thereof.

### In Witness Clause

In return for the payment of premium, and subject to the terms of this policy, coverage is provided as stated in this policy.

IN WITNESS WHEREOF, this Company has executed and attested these presents and, where required by law, has caused this policy to be countersigned by its duly Authorized Representative(s).

President                                      Corporate Secretary

---

**QUESTIONS ABOUT YOUR INSURANCE?**  Your agent or broker is best equipped to provide information about your insurance.  Should you require additional information or assistance in resolving a complaint, call or write to the following (please have your policy or claim number ready):

Zurich in North America
Customer Inquiry Center
1400 American Lane
Schaumburg, Illinois  60196-1056
**1-800-382-2150** (Business Hours:  8am - 4pm [CT])
**Email**: info.source@zurichna.com

---

| Insured Name: | THE STATE OF COLORADO ACTING BY AND THROUGH THE BOARD OF TRUSTEES OF THE COLORADO SCHOOL OF MINES |
| Reference Number: | EPC 9244196 00 |
| Effective Date: | 4/30/2012 |



**ZURICH**®

## THIS DISCLOSURE IS ATTACHED TO AND MADE PART OF YOUR POLICY.

# DISCLOSURE OF IMPORTANT INFORMATION RELATING TO TERRORISM RISK INSURANCE ACT

### SCHEDULE*

Premium attributable to risk of loss from certified acts of terrorism for lines of insurance subject to TRIA:

$4,235

*Any information required to complete this Schedule, if not shown above, will be shown in the Declarations.

### A.  Disclosure of Premium

In accordance with the federal Terrorism Risk Insurance Act ("TRIA"), as amended, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to the risk of loss from terrorist acts certified under that Act for lines subject to TRIA.  That portion of premium attributable is shown in the Schedule above.  The premium shown in the Schedule above is subject to adjustment upon premium audit, if applicable.

### B.  Disclosure of Federal Participation in Payment of Terrorism Losses

The United States Government may pay a share of insured losses resulting from an act of terrorism. The federal share equals 85% of that portion of the amount of such insured losses that exceeds the insurer retention.  The insurer retention equals 20% of the insurer's prior calendar year direct earned premium associated with lines of insurance subject to TRIA. TRIA is scheduled to expire on December 31, 2014.

### C.  Disclosure of $100 Billion Cap on All Insurer and Federal Obligations

If aggregate insured losses attributable to terrorist acts certified under TRIA exceed $100 billion in a Program Year (January 1 through December 31) and an insurer has met its deductible under the program, that insurer shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

### D.  Availability

As required by TRIA, we have made available to you for lines subject to TRIA coverage for losses resulting from acts of terrorism certified under TRIA with terms, amounts and limitations that do not differ materially from those for losses arising from events other than acts of terrorism.

### E.  Definition of Act of Terrorism under TRIA

TRIA defines "act of terrorism" as any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States:

1.  to be an act of terrorism;

2.  to be a violent act or an act that is dangerous to human life, property or infrastructure;

3.  to have resulted in damage within the United States, or outside of the United States in the case of an air carrier (as defined in section 40102 of Title 49, United States Code) or a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), or the premises of a United States mission; and

4.  to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

U-GU-630-C CW (12/07)
Page 1 of 2

Copyright ©2007 Zurich American Insurance Company
Includes copyrighted material of ISO Properties, Inc. with its permission

No act may be certified as an "act of terrorism" if the act is committed as part of the course of a war declared by Congress (except for workers' compensation) or if losses resulting from the act, in the aggregate for insurance subject to TRIA, do not exceed $5,000,000.

U-GU-630-C CW (12/07)
Page 2 of 2

Copyright ©2007 Zurich American Insurance Company
Includes copyrighted material of ISO Properties, Inc. with its permission

# Cap On Losses From Certified Acts Of Terrorism

 **ZURICH**®

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EPC 9244196 00 | 4/30/2012 | 4/30/2022 | 4/30/2012 | 37509000 | — | — |

**Named Insured and Mailing Address:**

THE STATE OF COLORADO ACTING BY AND
THROUGH THE BOARD OF TRUSTEES OF
COLORADO SCHOOL OF MINES
1500 ILLINOIS STREET
GOLDEN, CO 80401-1843

**Producer:**

ENVIRONMENTAL RISK AGENCY LLC
1627 W MAIN STREET, SUITE 285
BOZEMAN, MT 59715-4011

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Agribusiness Pollution Liability Insurance Policy - Claims Made and Reported Coverage**
**Environmental Cleanup and Liability Insurance Policy - Claims Made and Reported Coverage**
**Environmental Impairment Liability Insurance Policy - Claims Made and Reported Coverage**
**Environmental Services Package Policy**
**Excess Environmental Insurance Policy - Claims Made and Reported Coverage**
**Healthcare Pollution Liability Insurance Policy - Claims Made and Reported Coverage**
**Public Entity Pollution Liability - Claims Made and Reported Coverage**
**Real Estate Environmental Liability Insurance Policy - Claims Made and Reported Coverage**
**Remediation Stop Loss**
**Z Choice Pollution Liability**
**Lender Environmental Collateral Protection and Liability Insurance Policy - Claims Made and Reported Coverage**
**Lender Environmental Collateral Protection and Liability Insurance Outstanding Loan Balance - Claims Made and Reported Coverage**
**Follow Form Excess Liability Policy**
**Follow Form Excess Liability Policy - Claims Made and Reported Coverage**
**Commercial Umbrella Liability Policy**
**Commercial Umbrella Liability Policy - Claims Made and Reported Coverage**

**A.  Cap on Losses From Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act ("TRIA").  The Terrorism Risk Insurance Act provides that the Secretary of Treasury shall certify an act of terrorism:

1.  to be an act of terrorism;

2.  to be a violent act or an act that is dangerous to human life, property or infrastructure;

3.  to have resulted in damage within the United States, or outside of the United States in the case of an air carrier (as defined in section 40102 of Title 49, United States Code) or a United States flag vessel (or a vessel based

principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), or the premises of a United States mission; and

4.  to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

No act may be certified as an act of terrorism if the act is committed as part of the course of a war declared by Congress (except for workers' compensation) or if losses resulting from the act, in the aggregate for insurance subject to TRIA, do not exceed $5,000,000.

If aggregate insured losses attributable to one or more "certified acts of terrorism" exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

## B.  Application of Other Exclusions

The terms and limitations of a terrorism exclusion or any other exclusion, or the inapplicability or omission of a terrorism exclusion or any other exclusion, do not serve to create coverage which would otherwise be excluded, limited or restricted under this policy.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY SHALL APPLY AND REMAIN UNCHANGED.**